IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| PAULA F. DeFRANK | ) | |
| **Plaintiff** | ) | |
| | ) | |
| v. | ) | CASE NUMBER 1:07-cv-775-WKW |
| | ) | |
| ARMY FLEET SUPPORT, L.L.C., | ) | (JURY DEMAND) |
| **Defendant** | ) | |

**RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

## I. INTRODUCTION

Paula DeFrank filed this action against Army Fleet Support, L.L.C. (AFS) because AFS refused to accommodate her physical disabilities and terminated her employment. AFS is a subsidiary of L-3 Vertex and contracts with the Department of Defense to provide maintenance and logistical support to the U. S. Army's flight training program. AFS contends in this Motion for Summary Judgment that DeFrank can not maintain this action because the company is not subject to the provisions of Section 504 of the Rehabilitation Act of 1973; and further, that the Court should decline to exercise supplemental jurisdiction over her state law claim. The Defendant moves for summary judgment only on the issue of the Rehabilitation Act's applicability in this action, and on the appropriateness of the Court's exercise of supplemental jurisdiction over the state law claim if the federal claim is dismissed.

## II. STATEMENT OF UNDISPUTED FACTS[1]

1)      Army Fleet Support, L.L.C. was awarded a contract with the U.S. Department of Defense to perform maintenance and logistical support of the Army's helicopter fleet at Fort Rucker, Alabama. The contract began on December 1, 2003. (Dft. Brief, p. 8, ¶ 2; PX A: Affidavit of John L. Hamlin p. 1, ¶ 3).

2)      AFS's policy manual states that "Army Fleet Support is a government contractor and is therefore subject to the provisions of the Americans with Disabilities Act of 1990, the Rehabilitation Act of 1973, and the Vietnam Era Veterans Readjustment Assistance Act of 1974." (PX B: Hamlin Depo. p. 70:02-13; PX C: excerpt from AFS Policy Manual).

3)      As a term of its contract with the Department of Defense ("DoD") AFS agreed to subject itself to DoD's regulations. (PX A: Affidavit of John L. Hamlin, p. 4, ¶ 11). The DoD's regulations include provisions implementing Section 504 of the Rehabilitation Act.

4)      AFS has received training and technical assistance provided by employees of the Equal Employment Opportunity Commission approximately two times per year. (PX D: Whelan Depo., p. 52:11-20).

5)      This training was provided to AFS employees free of charge. (PX D: Whelan Depo. p. 54:02-06). There is no contract requirement that AFS receive such training by the EEOC. (PX B: Hamlin Depo. p. 57:13-16). Darlene Whelan, Director of

---

[1] The Plaintiff presents in this Response those facts which are necessary to respond to the Defendant's arguments that she can not bring this action under the Rehabilitation Act; and, that the Court should decline to exercise supplemental jurisdiction on her state law claim. The plaintiff fully reserves the right to address and dispute at trial any and all other matters presented in AFS's statement of "undisputed" facts.

2

Human Resources, also periodically telephoned the EEOC for guidance on compliance with the ADA. (PX D: Whelan Depo., p. 52:01-04). Whelan has testified that "they [EEOC representatives] give us their business cards and they **provide assistance** to us whenever we need it." (PX D: Whelan Depo. p. 52:13- 15)(*Emphasis added*)

6)      AFS's employees were also offered and received health and wellness training through the U.S. Army's "Soldier Center" at Fort Rucker. (PX D: Depo. p.32:05-12). The Soldier Center is an Army facility that, among other things, provides support for Army personnel on health-related issues including exercise, healthy eating habits, stress management, and smoking cessation. (PX D: Whelan Depo. p. 32:05-12; p. 34:12-18). AFS employees are permitted to participate in health and wellness activities along with military personnel. (PX D: Whelan Depo. p. 36:11-18). The military coordinates the programs and classes which are taught by civilian employees of the Department of Defense ("DoD"). (PX D: Whelan Depo. pp. 35:06-36:05; PX B: Hamlin Depo. p. 58:09). AFS received the benefits of the Army's health and wellness programs offered through its Soldier Center free of charge. (PX D: Whelan Depo. p. 36:06-10). These free programs are outside the scope of AFS's contract with the DoD because there is no requirement in AFS's contract that its employees participate in such programs. (PX B: Hamlin Depo. p. 59:15-19).

7)      AFS's management employees received free training through DoD on "lean management" practices. (PX B: Hamlin Depo. p. 41:15-19; p. 42:19-21). "Lean" training is designed to increase efficiency and productivity. (PX B: Hamlin Depo. pp. 41:22- 42:02). Some "Lean" training was provided by government employees. (PX B:

3

Hamlin Depo. p. 42:15-18). Approximately twenty-five to thirty AFS employees received "Lean" training at the University of Tennessee in Knoxville, Tennessee. The training lasted one week and consisted of forty hours of training through the University of Tennessee's School of Business. (PX B: Hamlin Depo. p.43:02-07). All expenses related to the "Lean" training were paid by the DoD, including travel expenses and the costs associated with staying for a week in Knoxville. (PX B: Hamlin Depo. p. 44:02).

8)      On another occasion, AFS employees traveled to Montgomery, Alabama, to receive further "Lean" training. All costs associated with this training also were paid by the DoD. (PX B: Hamlin Depo. p. 51:21-23).

9)      John Hamlin is one of the managers who received Lean training. (PX B: Hamlin Depo. p. 45:21-23). He is a better manager as a result of this training and his training will transfer to any other position with AFS or with any other company. (PX B: Hamlin Depo. p. 46:02-05). AFS has shown tangible results from "Lean" training and has become more efficient as a result of the training. (PX B: Hamlin Depo. p. 46:06-09).

10)     AFS has plans to continue its operations after the conclusion of the Ft. Rucker contract. (PX B: Hamlin Depo. p. 47:13-15). The contract is renewable for a ten-year period on an annual basis, and has currently been extended through September 2008. (Doc. 22-2: Dft Ex. A: p. 6) AFS has explored at least one other business opportunity outside its Ft. Rucker contract. (PX B: Hamlin Depo. p. 46:13-15). AFS's managers meet on occasion to discuss future planning and future business opportunities for AFS. (PX B: Hamlin Depo. p. 48:12-14). The "Lean" training received by AFS' managers will benefit AFS in any other business opportunity outside the Ft. Rucker maintenance contract. (PX B:

Hamlin Depo. p. 53:12-16).

11)    AFS also received "new equipment training" taught by military
personnel. New equipment training was provided for the Black Hawk helicopter. (PX B:
Hamlin Depo. p. 55:03-09). The company also received hazardous materials training. (PX
B: Hamlin Depo. p. 57:05-07). The company does not pay the DoD for such training.

12)    In addition to the use of the property of the Soldier's Center, AFS
employees are permitted to use the indoor swimming pool, gymnasium, racquet ball and
squash courts, locker rooms, saunas and steam rooms of the U. S. Army Physical Fitness
Center located on Fort Rucker, Alabama. (PX E: Physical Fitness Center Notice)

13)    AFS received the rent-free use of real property at Ft. Rucker from the
General Services Administration ("GSA"), including the use of land, aircraft hangars, and
buildings during the term of its maintenance contract. (PX B: Hamlin Depo. pp. 26:20 –
27:04).

14)    AFS staff has free access to and use of the government's library materials at
Ft. Rucker, which include technical manuals and copies of all applicable Army/DoD
regulations. (PX B: Hamlin Depo. p. 33:07-09).

15)    AFS is also loaned, at no cost, government furnished equipment and
property ("GFE" and "GFP") to utilize in its contract with the DoD. (PX B: Hamlin Depo.
p. 27:12-15). AFS has used the GFE during the contract. (PX B: Hamlin Depo. pp. 27:23 -
28:03). This GFE includes, but is not limited to, several hundred motor vehicles, more than
one hundred golf carts (or similar carts), computers, office equipment, and specialized
tools, among other things. (PX B: Hamlin Depo. p. 29:01-04). The contract has a lengthy

attachment itemizing the GFP and GFE which the DoD provides at no cost to AFS. (PX A: Affidavit of John L. Hamlin, ¶ 2, and Attachments to Section J.).

16)    The government performs all maintenance on the fleet of motor vehicles used by AFS through the Government Services Administration (GSA), and all fuel and other petroleum products are provided by the government. (PX B: Hamlin Depo. p. 30:11-18).

17)    Paula DeFrank was employed as an aircraft mechanic by DynCorp at Hanchey Field, Fort Rucker, Alabama, on November 30, 2003 and became an aircraft mechanic employed by AFS at the same location as of December 1, 2003. (Doc. 23: Dft. SOF ## 5, 6)

18)    DeFrank began to experience problems with her shoulder while working with DynCorp and was assigned to work as the parts-return mechanic to accommodate her lifting and bending restrictions.  DeFrank does not recall the initial date of this assignment but knows that it occurred prior to December 2003 and she continued to work in parts-return until her accommodations were withdrawn on April 4, 2006. (PX I: DeFrank Depo. p.  47:11-20; p. 51:18-20; pp. 55:18 – 56:06; pp. 63:14 – 64:07; p. 74:07-15; p. 88:01-23; pp. 93:23 – 95:23)

19)    DeFrank presented return-to-work forms or doctor's notes that included limitations on her ability to lift  more than 20 pounds and/or engage in bending, reaching and/or climbing on April 21/24, 2000; November 3, 2000; January 26, 2001; March 23, 2001; June 15, 2001; August 23, 2001; December 6/7, 2001; January 10, 2002; June 20, 2002; April 30, 2003; June 20, 2003; June 28, 2004; February 10, 2005; February 22, 2005; July 28, 2005; December 22, 2005; January 11, 2006; March 3, 2006; and, March

27, 2006.    These physical limitations were accommodated by DynCorp and/or AFS on each occasion but one by allowing her to work as the parts-return mechanic at Hanchey Field.  (PX J: Return to Work forms; Doctor's Notes; PX I: DeFrank Depo.  p. 47:11-20; p. 51:18-20; p. 55:18 – p. 56:06; pp. 63:14 – 64:07; p. 74:07-15; p. 88:01-23; pp. 93:23 – 95:23) (Doc. 23: Dft. SOF ## 10, 12)

20)    DeFrank was denied accommodation by Hanchey Field assistant manager Ronald Farrington and manager Lowell Green on December 22, 2005, for restrictions stated by her physician as "no lifting more than 20 pounds, on excessive bending". (PX K: RTW dated 12/22/05)    AFS manager Green rescinded this denial of accommodation on January 11, 2006 and approved accommodation in the parts return position retroactive to December 27, 2005. (PX L: RTW 1/11/06)

21)    On April 4, 2006, DeFrank's supervisor arbitrarily withdrew the accommodation granted her by Green and ordered her to return to full-duty on the aircraft.  DeFrank's supervisor denied having any knowledge of her restrictions; failed to engage in any interactive process with her regarding her restrictions; and informed her that her physical limitations did not matter. (PX I: DeFrank Depo. pp. 173:05-174:09) DeFrank's doctor ordered her not to return to work for at least thirty days. (Doc. 23: Dft. SOF # 16)

22)    DeFrank presented AFS with another return to work, following additional surgery, on June 14, 2006 which stated her restrictions as "no lifting above 20 pounds; no excessive bending".    (PX M: RTW 6/14/06)    AFS again failed to engage in any interactive process with DeFrank and denied her accommodation for her physical limitations. (PX I: DeFrank Depo. p. 195:14 – 196:10) (Doc. 23: Dft. SOF # 17, 18)

23)    DeFrank's physical restrictions substantially limit her from access to 65.29% of the jobs available in the labor market in the state of Alabama that require education, training, and prior experience similar to hers. (PX N: Vocational Declaration p. 2 ¶ 7)

24)    AFS notified DeFrank on October 19, 2006 that her employment had been terminated as of October 12, 2006.  (PX O: letter dated 10/19/06)    DeFrank sought assistance from AFS's human resource department regarding application for unemployment compensation but was informed that she could receive unemployment because she was still an "employee" of AFS. (PX I: DeFrank Depo. p. 209:17-20) DeFrank relied upon this representation and did not apply for unemployment.  (Doc. 23: Dft SOF # 22)

## III. ARGUMENT

A.    The plaintiff has a cause of action under Section 504 of the Rehabilitation Act of 1973.

The argument of AFS that DeFrank does not have the right to a private cause of action for disability discrimination under the Rehabilitation Act of 1973, as amended in 1978, is not a correct statement of the law.[2]  Section 505(a)(2) of the Act  provides that "[t]he remedies . . . set forth in title VI of the Civil Rights Act of 1964 shall be available to any person aggrieved by any act or failure to act by any recipient of Federal assistance . . . under [§ 504]." 29 U.S.C. § 794a (a)(2). Although Title VI, 42 U.S.C. § 2000d et seq., which prohibits discrimination on

---

[2] AFS argues extensively in brief that DeFrank could have brought a claim of disability discrimination under Section 503 of the Rehabilitation Act, and that Section 503 does not provide for a private cause of action.  The argument is not relevant to the facts or issues in this case.  DeFrank's claim in this lawsuit is clearly brought pursuant to Section 504, and she does have a private cause of action under Section 504.

the basis of race, color, or national origin in programs and activities receiving federal financial assistance, does not by itself expressly provide for a private cause of action, the U. S. Supreme Court has "found an implied right of action, and Congress has acknowledged this right in amendments to the statute, leaving it beyond dispute that private individuals may sue to enforce Title VI." *Barnes v. Gorman*, 536 U.S. 181, 185 (2002) (cited in *Sheely v. Mri Radiology Network, P. A.*, 505 F.3d 1173, 1191 (11th Cir. 2007)). See also: *Prewitt v. United States Postal Service*, 662 F.2d 292, 302 (5th Cir. 1981) (Plaintiff *has an implied right of action under Section 504 of the Rehabilitation Act.*); *Sandoval v. Hagan*, 197 F.3d 484 (11th Cir. 1999). The Eleventh Circuit has recently acknowledged this right of private action under Section 504 of the Rehabilitation Act in holding that non-economic compensatory damages were available to plaintiffs under the Section 504 of the Act. *Sheely v. Mri Radiology Network, P. A.*, 505 F.3d 1173, 1206 (11th Cir. 2007).

B.    <u>Army Fleet Support is a recipient of federal financial assistance.</u> Army Fleet Support has elected to subject itself to the provisions of Section 504 of the Rehabilitation Act of 1973, as amended, by accepting federal financial assistance. Section 504(a) prohibits discrimination against qualified individuals with a disability under any program or activity receiving Federal financial assistance or under any program or activity conducted by any executive agency or by the United States Postal Service, and charges the head of each executive agency with responsibility for promulgating regulations to carry out the amendments to

Act as established by the Congress.[3]  The Department of Defense has established

its regulations at *32 C.F.R. 56.3*, defining "federal financial assistance" as:

> (b) Federal financial assistance. Any grant, **loan**, contract (other than
> a procurement contract or a contract of insurance or guaranty**), or
> any other arrangement by which the Federal Government
> provides or otherwise makes available assistance in the form of**:
> (1) Funds.
> (2) **Services performed by Federal personnel, including
> technical assistance, counseling, training, and provision of
> statistical or expert information**.
> (3) **Real and personal property** or any interest in **or use of such
> property**, including:
> (i) Transfers or leases of such property for less than fair market
> value or for reduced consideration.
> (ii) Proceeds from a subsequent transfer or lease of such property
> if the Federal share of its fair market value is not returned to the
> Federal government. *(Emphasis added.)*

AFS argues broadly to the Court in this motion that it is exempt from the

requirements of Section 504 because it is a recipient of a procurement contract

from the Department of Defense.  The plaintiff does not dispute that AFS has such

a contract; that it was awarded following a competitive process; or, that the

financial value of the contract to AFS makes it the largest procurement contract in

---

[3] Sec. 504.(a) *No otherwise qualified individual with a disability in the United States, as
defined in section 7(20), shall, solely by reason of her or his disability, be excluded from
the participation in, be denied the benefits of, or be subjected to discrimination under any
program or activity receiving Federal financial assistance or under any program or
activity conducted by any executive agency or by the United States Postal Service. The
head of each such agency shall promulgate such regulations as may be necessary to
carry out the amendments to this section made by the Rehabilitation, Comprehensive
Services, and Developmental Disabilities Act of 1978. Copies of any proposed regulation
shall be submitted to appropriate authorizing committees of Congress, and such
regulations may take effect no earlier than the thirtieth day after the date on which such
regulation is so submitted to such committees.*

existence. (Doc. 23: Dft. Brief at pp. 3-4)    AFS does, however, willingly and knowingly subject itself to the provisions of Section 504 when it chooses to receive and benefit from services provided by federal personnel including technical assistance, counseling, training, and provision of statistical or expert information, as well as through its use of real and personal property provided by the federal government.

1.   <u>AFS receives training and technical assistance from federal personnel.</u>

There is no dispute that AFS solicited and received training from representatives of the Equal Employment Opportunity Commission on several occasions. (PXD: Whelan Depo. p. 52:01-20; p. 54:02-06) In addition, AFS personnel frequently sought and received technical assistance and counseling from employees of the EEOC regarding federal regulations and requirements.  (PX D: Whelan Depo. p. 52:13-15) Such training and assistance is not required by AFS's procurement contract, and is of the kind and type that is sought and received by business entities that do not have federal procurement contracts.

In addition, there is no dispute that AFS employees were provided training through the health and wellness programs offered by the Army's "Soldier Center" at Fort Rucker, Alabama. (PX D: Whelan Depo, p.32:05-12). The "Soldier Center" is a facility owned and operated by the DoD for the purpose of enhancing the health and general well being of its personnel. (PX D: Whelan Depo. p. 34). AFS employees were permitted to participate, and did participate, in classes and seminars coordinated by the military and taught by civilian DoD employees. (PX

D: Whelan Depo. p. 35:12-19; PX B, Hamlin Depo. p. 58:09). These programs included assistance and training related to issues such as healthy eating habits, exercise, stress management, and smoking cessation which was provided by soldiers and employees of the federal government at no cost to AFS or its employees. (PX D: Whelan Depo, p. 36:06-10). These services were offered and accepted outside the requirements of AFS' procurement contract with the DoD. (PX B, Hamlin Depo. p. 59:15-19).

AFS also received management training which was provided and/or paid for by the DoD. "Lean" management training is designed to help managers increase efficiency and productivity. The DoD provided forty hours of "Lean" training to AFS' management team through the University of Tennessee's School of Business. The training lasted one week and was conducted in Knoxville, Tennessee. AFS received this training at no cost, including all associated travel and lodging expenses. (PX B: Hamlin Depo. pp. 41:15 – 42:21; p. 43:02-07; p. 44:02) Additional AFS employees also received "Lean" training in Montgomery, Alabama, on another occasion. This training was also provided at no cost to AFS. (PX B: Hamlin Depo. p. 51:21-23)

Hamlin, the former Director of Business and Contracts and now General Manager of AFS, has testified that he was a more effective manager after he received the forty hours of instruction in Knoxville. (PX B: Hamlin Depo. p.46:02-05). He has also testified that he noted an improvement in the performance of other AFS managers in attendance. (PX B: Hamlin Depo. p.

46:06-09). Lowell Green and Ronald Farrington, the manager and assistant managers of Hanchey Field, received "LEAN" training. (PX G: Green Depo. P. 10:02-06; PX H: Farrington Depo. P. 23:16-18) AFS has benefitted from this free training which was not a service or compensation procured in their contract with DoD. Hamlin has testified that the "Lean" training would benefit AFS in future endeavors outside the current Fort Rucker contract. (PX B: Hamlin Depo. p.46:06-09). AFS' management team periodically meets to discuss future opportunities for AFS beyond the current contract. (PX B: Hamlin Depo. p. 46:12-14). On at least one occasion, AFS pursued an opportunity beyond the current contract. (PX B: Hamlin Depo. p. 46:13-15). AFS has received federal financial assistance via the free "Lean" management training because it received technical skills and knowledge that it did not presently possess and which was outside the terms of the "procurement contract."

Additionally, AFS employees also received hazardous materials training and new equipment training provided at no cost by federal personnel. (PX B: Hamlin Depo. p. 57:05-07). This training was conducted at Fort Rucker by military personnel.

AFS, in its brief (Doc. 23: pp. 20-25), argues that it did not receive federal financial assistance because it only received funds through a procurement contract with the DoD, and that it only used government equipment and services because it was required to do so by that contract. However, neither the EEOC training; the health and wellness training; the management training; nor, the hazardous materials and equipment training

were required in the contract. Even under AFS's broad interpretation of the so-called "procurement contract exception," AFS cannot claim that its receipt of these voluntary federal training and technical assistance services is required by the terms of its procurement contract. Accordingly, AFS is subject to the nondiscrimination requirements of Section 504 of the Rehabilitation Act as an entity that receives federal financial assistance.

2. AFS accepted the loan of, and its employees utilized, real and personal property which was owned and controlled by the Federal government.

There is no dispute that AFS arranged the benefit of the use of the Army's facilities at the Soldier's Center referenced above, or that AFS entered into an agreement or arrangement with the U. S. Army that provided its employees the benefits of the Physical Fitness Center located at Fort Rucker. (PX E: Physical Fitness Center Notice) This facility contains gymnasiums, racquetball and squash courts, an indoor pool, locker rooms, and steam and sauna rooms. *(Id.)* AFS employees are allowed free access to and use of these facilities, which are not available to their families or the general public, by showing their AFS employee badge and confirming their social security number. (PX E: Fitness Center Contractor Employee Rules) AFS has confirmed and extended this arrangement for the benefit of its employees. (PX F: e-mail dated 2/14/07)

The use of the government property noted above brings AFS within the clear language of the DoD's regulations implementing Section 504 *(32 CFR 56.3),* and nothing more is required to establish that it is accountable under the law for its discriminatory acts against DeFrank.

In addition to the federal property referenced above, AFS received the free use of government furnished equipment (GFE) and government real property (GFP). The contract has an attachment listing all the equipment and property provided for AFS's use during the term of the contract. (PX A: Affidavit of John L. Hamlin, ¶ 7, and Attachments, Section J). The attachment to Dft. Exhibit A to the present Motion lists 86 separate properties located on Fort Rucker, in Daleville, Alabama, and in surrounding areas, that are provided for AFS's use during the term of the contract. (Doc. 22-2: Dft. Ex. A at pp. 12-13). The attachment also lists several hundred motor vehicles (pp. 14-17), and there are more than one hundred motorized carts, computers, desks, chairs, and other office equipment, among many other things made available to AFS by the GSA. (PX B: Hamlin Depo. p. 29:01-04)  AFS argues that the loan of this federal equipment and property is exempt from the law because: 1) the government required the use of this equipment and property as a condition of the contract; 2) the government saved costs as a result of allowing AFS to use its equipment and property; and, 3) AFS did not "profit" from its use.  AFS's arguments are misplaced.

AFS made a business decision to submit a bid for this contract with full knowledge that it would receive the loan of government owned equipment and real and personal property to use during the term of the contract.  AFS chose to bring itself under the requirements of the Rehabilitation Act by this decision to bid for and accept the maintenance contract at Fort Rucker. If AFS did not wish to subject itself to Section 504, then it could have and should have explored other business

15

opportunities.

The matter of whether the government realizes a cost savings, or whether AFS "profits", from loaning property to recipients is not an exception enumerated in Section 504 itself, or in any of the DoD's implementing regulations. AFS is asking this Court to read a limiting factor into Section 504 that plainly is not there. This reading would subvert the intent of Congress to define "federal financial assistance" broadly in keeping with its goal of ensuring that federal funds are not used to support discrimination. The statute merely requires that a program or activity receive federal financial assistance in any of the forms enumerated, including the loan of equipment and property.

Although there is a "procurement contract" exception to "federal financial assistance," the cases discussing such procurement contracts do not address the ancillary loan of cost-free government furnished equipment and property. The cases cited by AFS, such as *DeVargas and Martin Marietta,* involve contracts for government purchase of goods or services for fair market value. Plaintiffs in those cases contended that the receipt of government funds as payment for goods and services itself constituted federal financial assistance. These cases are plainly distinguishable from the facts and issues before this Court.

The provision of this GFE and GFP is not a component of DoD's procurement contract with AFS. The DoD defines "procurement contract" at 32 CFR 2.102 as:

A legal instrument which, consistent with 31 U.S.C. 6303, reflects a

relationship between the Federal Government and a State, a local government, or other recipient when the principal purpose of the instrument is to acquire property or services for the direct benefit or use of the Federal Government. See the more detailed definition for contract at 48 CFR 2.101.

48 CFR 2.101 defines "contract" and "contracting" as:

> "*Contract* means a mutually binding legal relationship obligating the seller to furnish the supplies or services (including construction) and the buyer to pay for them. It includes all types of commitments that obligate the Government to an expenditure of appropriated funds and that, except as otherwise authorized, are in writing. In addition to bilateral instruments, contracts include (but are not limited to) awards and notices of awards; job orders or task letters issued under basic ordering agreements; letter contracts; orders, such as purchase orders, under which the contract becomes effective by written acceptance or performance; and bilateral contract modifications. Contracts do not include grants and cooperative agreements covered by 31 U.S.C. 6301, *et seq.* For discussion of various types of contracts, see part 16.

> *Contracting* means purchasing, renting, leasing, or otherwise obtaining supplies or services from nonfederal sources. Contracting includes description (but not determination) of supplies and services required, selection and solicitation of sources, preparation and award of contracts, and all phases of contract administration. It does not include making grants or cooperative agreements.

DeFrank does not contend that government payments to AFS for goods or services are a form of federal financial assistance. The opinions discussed by AFS in its brief do not pertain to the issue of whether contractors had the rent free "use of" GFE and government real property. In this case, the "seller" (AFS) did not "furnish" the equipment and property at issue; the "buyer" (DoD) did not "pay" for them; and they were not "acquired" in the contract "for the direct benefit or use of the Federal Government." The loan of this federally owned property and

17

equipment is ancillary to the procurement contract between AFS and DoD, and is plainly not within the DoD's own definition of a procurement contract. DeFrank asserts that ignoring this distinction between contracts with and without the free use of government equipment and property is contrary to the plain language of the DoD implementing regulation. The regulation provides that "any interest in or use of" government-owned real or personal property is a "form" of federal financial assistance." As this Circuit has recognized, in *Jones v. Metropolitan Atlanta Rapid Transit Authority*, 681 F.2d 1376, 1379 (11th Cir.1982), *cert. denied*, 465 U.S. 1099 (1984), that "[o]n its face ... [section 504] applies to programs receiving federal financial aid **of any kind.**" (*emphasis added*). See also *Consolidated Rail Corp. v. Darrone*, 465 U.S. 624 (1984). In *Jones*, the Court noted that "the legislative history to the 1974 amendments is replete with notations indicating that Section 504 was intended to encompass programs receiving federal financial assistance of any kind...." *Jones*, 681 F.2d at 1379- 80. Importantly, Congress' "single overriding purpose" in enacting Section 504 and similar civil rights laws was to ensure that the funds of the United States were not used to support discriminatory practices. See *United States v. Baylor University Medical Center*, 736 F.2d 1039, 1042-43 (5th Cir.1 984), *cert. denied*, 469 U.S. 1189 (1985).

    C.  The Court should not decline to exercise supplemental jurisdiction over DeFrank's state law claim.

    This Court has the authority to exercise supplemental jurisdiction over

DeFrank's state law claim pursuant to 28 U.S.C. § 1367(a).  28 U.S.C. § 1367(c)[4] sets

forth considerations upon which a District Court may decline jurisdiction, including when

the district court has dismissed all claims over which it held original jurisdiction.  None

of these factors apply here.  The defendant urges the Court, in the alternative, to grant it

summary judgment on DeFrank's state law claim but points only to disputed issues of

fact and law in support of its "alternative".  For example, Westrick's representation was a

statement of fact that DeFrank relied upon to her detriment; not an "opinion" or

"prediction" as the defendant alleges in brief. (Doc. 23: p. 26).  These issues remain for

resolution by the trier of fact in this matter, and the defendant's alternative is due to be

denied.

## IV. CONCLUSION

AFS' Motion for Partial Summary Judgment is due to be denied with

respect to Plaintiff's claim for damages under the Rehabilitation Act of 1973. AFS

received "federal financial assistance" in the forms of federally funded training

and technical assistance which was outside the requirements of its procurement

contract, and by the free use of government real and personal property. As an

entity that receives federal financial assistance, AFS is covered by the Act.

Additionally, there are sufficient commonalities in parties, facts, and probable

---

[4] (1) the claim raises a novel or complex issue of State law,
  (2) the claim substantially predominates over the claim or claims over
which the district court has original jurisdiction,
  (3) the district court has dismissed all claims over which it has original
jurisdiction, or
  (4) in exceptional circumstances, there are other compelling reasons for
declining jurisdiction.

witnesses that this Court should exercise its authority under 28 USC 1367 for supplemental jurisdiction of the state law claim in this action in the interest of judicial economy and efficiency.

WHEREFORE, premises considered, DeFrank respectfully requests the entry of an Order denying AFS' Motion for Summary Judgment with respect to her claim for damages under the Rehabilitation Act of 1973, and the declination of supplemental jurisdiction over her state law claim.

Respectfully submitted this 4th day of June 2008.

/S/ **JIMMY JACOBS**
JIMMY JACOBS (JAC051)
Attorney for Plaintiff
4137 Carmichael Rd, Ste 100
Montgomery, Alabama 36106
(334) 215-1788

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court using CM/ECF system and service will be perfected upon counsel of record following this the 4th day of June 2008.

/s/JIMMY JACOBS
Jimmy Jacobs (JAC051)
4137 Carmichael Road, Ste 100
Montgomery, Alabama 36106
(334)215-1788

COUNSEL OF RECORD:

Kirk C. Shaw, Esq.
ARMBRECHT JACKSON LLP
Post Office Box 290
Mobile, Alabama 36601
Telephone: (251) 405-1302

Facsimile: (251) 432-6843

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **PAULA F. DeFRANK** | ) | |
| **Plaintiff** | ) | |
| | ) | |
| **v.** | ) | **CASE NUMBER 1:07-cv-775-WKW** |
| | ) | |
| **ARMY FLEET SUPPORT, L.L.C.,** | ) | **(JURY DEMAND)** |
| **Defendant** | ) | |

**PLAINTIFF'S LIST OF EXHIBITS SUBMITTED IN RESPONSE**
**TO THE MOTION FOR SUMMARY JUDGMENT**

PX A:    Affidavit of John L. Hamlin, dated June 15, 2007, with attachment

PX B:    Excerpts from the Deposition of John L. Hamlin; June 21, 2007

PX C:    Excerpt from AFS Policy Manual

PX D:    Excerpts from the Deposition of Darlene A. Whelan; June 20, 2007

PX E:    Physical Fitness Center Notice

PX F:    AFS e-mail dated 2/14/07

PX G:    Excerpt from the Deposition of Lowell A. Green, Jr.; April 2, 2008

PX H:    Excerpt from the Deposition of Ronald V. Farrington; April 2, 2008

PX I:    Excerpts from the Deposition of Paula F. DeFrank; March 27, 2008

PX J:    Return To Work forms; Doctor's Notes;

PX K:    Return To Work form dated 12/22/05

PX L:    Return To Work form dated 1/11/06

PX M:    Return To Work form dated 6/14/06

PX N:    Vocational Declaration and Report by Joseph Miller

PX O:    AFS letter dated 10/19/06

# PLAINTIFF'S

# EXHIBIT A

**DeFrank v. Army Fleet Support, L.L.C.; Case No. 1:07-cv-775-WKW**

STATE OF ALABAMA

COUNTY OF DALE

## AFFIDAVIT OF JOHN L. HAMLIN

John L. Hamlin, after being first duly sworn, deposes and says as follows:

1.    My name is John L. Hamlin. I am over the age of majority and competent to testify to the matters stated herein. This affidavit is based on my personal knowledge.

2.    I am Director, Business and Contracts, for Army Fleet Support, LLC ("AFS"). I have held this position since December 2005.

3.    In September, 2003, AFS was notified that it was the successful bidder in response to the US Army Aviation & Missile Command's ("the Government's") Request for Proposals to provide maintenance and logistics support, effective December 1, 2003, to aircraft assigned to the US Army Aviation Center, Aviation Technical Test Center ("ATTC"), US Army Aeromedical Research Laboratory and other tenant and satellite units on Fort Rucker, Alabama. The primary objective of the contract awarded to AFS ("the Contract") by the Government was, and is, to provide aircraft maintenance in support of the flight training programs at Fort Rucker.

4.    AFS was awarded this Contract through competitive bidding that involved the incumbent contractor, DynCorp Technical Services, LLC, Sikorsky Support Services Incorporated ("SSSI"), a previous contractor, and others.

5.    This Contract is the largest aircraft maintenance contract in the Department of Defense. More than 3,200 people are employed by AFS in its maintenance and

PLAINTIFF'S
EXHIBIT

16

logistics program at Fort Rucker.

6.    The services performed by AFS under the Contract are on a Cost

Reimbursable Plus Award and Incentive Fee basis, as provided in the Request for

Proposal upon which all bidders bid.  In other words, AFS is reimbursed by the

Government for its costs, plus an agreed percentage of the savings below target costs and

the opportunity for incentive fees, based on performance.  The base period of the Contract

was for one year, with options to extend up to a total of ten years, three months.

Currently, the Contract has been extended by the Government through September 30,

2008.

7.    Per the contract terms dictated by the Government in its Request for

Proposals, "[a]ll work will be performed in government furnished facilities at Fort

Rucker, Alabama, and other locations as required." (See § C.1 of Attachment 1

(Continuation Sheet) of the Performance Work Statement attached to my affidavit.)  The

Government's Contract further provides that "[t]he Government will furnish the

materials, supplies, equipment, machinery, [and] tools specified in the exhibits [to the

Contract]." (See § C.10.1 of Attachment 1 (Continuation Sheet) of the Performance

Work Statement attached to my Affidavit.)  These materials, supplies, etc. include:

existing aircraft maintenance facilities; Government-owned vehicles; new equipment

training for the maintenance of new equipment that AFS is required to support; protective

and flight clothing; utilities; aviation and motor vehicle fuels, oils, and petroleum

2

products required in the execution of the Contract; and reproduction (duplication) services. (See §§ C.10.1.1. - C.10.7 and Attachments 9, 9a, 10, 11 & 14.)   AFS is accountable to return the facilities and non-expendable property to the Government, or turn them over to the successor contractor, at the conclusion of this Contract.

8.     The furnishing of the above property pursuant to the Contract is not a subsidy or gift to AFS by the Government.  These provisions were in the Request for Proposal issued by the Government and on which AFS and all other bidders submitted their Proposals.  As a practical matter, since the objective of the Contract is to provide aircraft maintenance in support of the flight training programs at Fort Rucker, and the Government owns all of the real property and facilities comprising Fort Rucker, the successful bidder must maintain its operation on Fort Rucker to accomplish its mission in a timely manner.  The facilities on Fort Rucker and most of the equipment there that are used by AFS, pre-existed the onset of the Contract and were used by previous contractors.

9.     It is my understanding that the Government has entered similar contracts with other maintenance contractors over, approximately, the last fifty years.  Were the Government not to furnish the property and services listed, the successful bidder would have to furnish that property and, in turn, charge the Government for same on a "cost-plus" basis.

10.     The Government's furnishing of certain facilities and property for AFS's

3

use does not increase AFS=s profits.  If anything, it reduces AFS=s profits since the Contract is a Acost-plus@ one, and AFS has no opportunity to earn a profit on the cost of the facilities and property furnished by the Government.

11.    In performing its Contract with the Government, AFS is subject to the regulations listed in § C.12 of Attachment 1 (Continuation Sheet) of the Performance Work Statement attached to my affidavit.  Those regulations include regulations of The Department of Defense and The Department of the Army.

Further, Affiant saith not.

_John L. Hamlin_____

JOHN L. HAMLIN

Sworn to and subscribed to before me on
this the _15th_ day of June, 2007.

_____
NOTARY PUBLIC

[Affix Notarial Seal]

My Commission Expires:

_June 20, 2010_____

4

SECTION J
ATTACHMENT 10

PIIN/SINN: DAAH23-03-C-0345
MOD/AMD _____

Page 1 of 2

## GOVERNMENT FURNISHED PROPERTY - FACILITIES

The facilities identified with this Performance Work Statement will be provided to the Contractor by the Government.  (*indicates shared with Government)

| FACILITY NO. | DESCRIPTION - FIELD | TOTAL AREA |
|---|---|---|
| 405 | AC Comp Maintenance-Ground Equip Shop-Main Post | 12400 |
| 412 | Admin General Purpose-ACLC | 14602 |
| 413 | Flam Material Storage-Motor Pool-Main Post | 120 |
| 414 | Tech Publication Storage - Main Post | 288 |
| 415 | AC Comp Maintenance - AMSS - Main Post | 71176 |
| 416 | AC Paint Shop - AMSS - Main Post | 3800 |
| 423 | Storage General Purpose Inst-AMSS - Main Post | 400 |
| 424 | Storage General Purpose Inst-AMSS - Main Post | 48 |
| 426 | QA/CAL General Purpose-X-Ray - Main Post | 638 |
| 427 | AC Parts Storage - AMSS - Main Post | 1800 |
| 429 | Storage General Purpose - AMSS - Main Post | 288 |
| 1003 | Storage General Purpose – Main Post (STAMIS) | 6000 |
| 1004 | Storage General Purpose - Main Post (STAMIS) | 9000 |
| 1005 | Storage General Purpose - Main Post (STAMIS) | 9000 |
| 1013 | AC Comp Maintenance - Trans Run Stand - Main Post | 3000 |
| 1106 | Mgmt General Purpose – QDR | |
| 1206 | Flam Material Storage - Main Post | 1200 |
| | AC Parts Storage - | 780 |
| | Gear -Warehouse | 9000 |
| 1302 | Storage General Purpose -Ind Property Warehouse | 9100 |
| 1303 | Storage General Purpose - Shipping Warehouse | 9000 |
| 1305 | Storage General Purpose - Receiving Warehouse | 9000 |
| 1401 | Storage General Purpose - AMSS Warehouse | 9320 |
| 1402 | Storage General Purpose - AMSS Warehouse | 9000 |
| 7205 | Flam Material Storage | 120 |
| 10401 | AC Engine Test Cell - Tank Hill | 240 |
| 10406 | Sep Toilet/Shower - Tank Hill | 64 |
| 25105 | AC Maintenance Hanger - Knox | 21801 |
| 25161 | Maintenance General Purpose - Knox Motor Pool | 3000 |
| 25162 | Flam Material Storage - Knox | 1,200 |
| 25165 | AC Maintenance Hanger - Knox | 58,713 |
| 25166 | Storage Bldg - Knox Warehouse | 14,000 |
| 25641 | Ammo Break Down Area - Molinelli Range | 400 |
| 25642 | Storage Bldg – Molinelli Range | 352 |
| 25645 | General Storage + Break Room – Molinelli Range | 1,200 |
| 25646 | Latrine – Molinelli Range | 352 |
| 25647 | Jet Fuel Storage ABV - Molinelli Range | 1,120 |
| 30101 | AC Maintenance Hanger - Cairns | 37,989 |
| 30103 | AC Maintenance Hanger - Cairns | 35,392 |
| 30113 | AC Maintenance Hanger - Cairns | 4,000 |
| 30301 | AC Maintenance Hanger - Cairns | 24,616 |
| 30302 | AC Maintenance Hanger - Cairns | 5,670 |
| 30303 | AC Maintenance Hanger - Cairns | 24,436 |
| 30304 | AC Maintenance Hanger - Cairns | 4,000 |
| 30306 | AC Parts Storage - Cairns | 1,000 |
| 30308 | Storage Shed General Purpose - Cairns | 64 |
| 40105 | Storage General Purpose - Lowe | 120 |

SECTION J
ATTACHMENT 10

PIIN/SINN: DAAH23-03-C-0345
MOD/AMD _____

Page 2 of 2

## GOVERNMENT FURNISHED PROPERTY - FACILITIES

| FACILITY NO. | DESCRIPTION - FIELD | TOTAL AREA |
|---|---|---|
| 40106 | Navy Building, Air - Lowe | 36 |
| 40108 | Storage Shed General Purpose - Lowe | 120 |
| 40113 | AC Maintenance Hanger - Lowe | 25,058 |
| 40114 | AC Comp Maintenance-Avionics & Supply - Lowe | 2,000 |
| 40115 | AC Parts Storage - Lowe | 3,452 |
| 40116 | Flam Material Storage — Lowe | 120 |
| 40117 | AC Maintenance Hanger - Lowe | 35,392 |
| 40119 | Storage Shed-Paint - Lowe | 140 |
| 40120 | AC Maintenance Hanger - Lowe | 34,220 |
| 40128 | Maintenance-Vehicle & Ground Equip Shop - Lowe | 1,000 |
| 40135 | AC Paint Shop - Lowe | 7,273 |
| 40137 | Storage Shed Gen Purpose - Lowe | 5,000 |
| 40139 | AC Plastic Media Stripping - Lowe | 3,200 |
| 40146 | Flam Material Storage - Lowe | 200 |
| 40152 | Flam Material Storage - Lowe | 120 |
| 40188 | Admin General Purpose-by Washrack - Lowe | 480 |
| 5004T | Admin General Purpose-Trailer - Hanchey | 840 |
| 5005T | Admin General Purpose-Trailer - Hanchey | 840 |
| 5006T | Admin General Purpose-Trailer - Hanchey | 1,440 |
| 50130 | Hanger Shop Space-Avionics - Hanchey | 7,500 |
| 50132 | Storage Shed General Purpose - Hanchey | 288 |
| 50201 | AC Maintenance Hanger - Hanchey | 35,213 |
| 50202 | AC Maintenance Hanger - Hanchey | 15,607 |
| 50203 | AC Parts Storage - Hanchey | 14,400 |
| 50204 | AC Maintenance Hanger - Hanchey | 15,164 |
| 50205 | Flam Material Storage - Hanchey | 925 |
| 50207 | AC Maintenance Hanger - Hanchey | 14,500 |
| 50208 | AC Comp Maintenance-Supply/Armament Repair | 15,638 |
| 50209 | AC Maintenance Hanger - Hanchey | 18,585 |
| 50210 | Flam Material Storage - Hanchey | 232 |
| 50211 | Storage General Purpose-Motor Pool/Eng Shop | 2,530 |
| 60104 | AC Maintenance Bay - Shell Field | 8,471 |
| 60105 | AC Maintenance Bay - Shell Field | 8,471 |
| 60106 | POL Storage - Shell Field | 120 |
| 60110 | Avionics/Flight Line (right side only)- Shell | 1,620 |
| 60113 | QC/PC/Test Flight/Records - Shell | 4,000 |
| 60118 | Motor Pool/Sheet Metal - Shell | 4,000 |
| 60126 | Supply/Storage - Shell | 4,000 |
| L2840 | Admin General Purpose-Data Processing - Daleville | 5,000 |

SECTION J
ATTACHMENT 11

PIN/SINN: DAAH23-03-C-0345
MOD/AMD _____
Page 1 of 4

## GSA VEHICLE DENSITY LISTING

Listed below are the vehicles provided by GSA.  A joint inventory will be made on the contract clause "Continuity of Services" during the Phase-In-Phase-Out (PIPO)

| GSA # | TMP # | Year | Model |
|-------|-------|------|-------|
| G12-13221 | D001 | 1999 | BREEZE |
| G32-00969 | D200 | 2001 | TCFE2409 |
| G41-33045 | D027 | 1997 | ASTRO |
| G41-33048 | D048 | 1997 | S10 |
| G41-33049 | D049 | 1997 | S10 |
| G41-33050 | D045 | 1997 | S10 |
| G41-33051 | D051 | 1997 | S10 |
| G41-33052 | D012 | 1997 | S10 |
| G41-33053 | D053 | 1997 | S10 |
| G41-33054 | D054 | 1997 | S10 |
| G41-33055 | D035 | 1997 | S10 |
| G41-33056 | D005 | 1997 | S10 |
| G41-33057 | D057 | 1997 | S10 |
| G41-33058 | D038 | 1997 | S10 |
| G41-34376 | D041 | 1997 | S10 |
| G41-34377 | D043 | 1997 | S10 |
| G41-34383 | D026 | 1997 | F150 |
| G41-34384 | D029 | 1997 | F150 |
| G41-34388 | D055 | 1997 | F150 |
| G41-34395 | D036 | 1997 | AEROSTAR |
| G41-36919 | D042 | 1998 | S10 |
| G41-42914 | D021 | 1999 | WINDSTAR |
| G41-42938 | D056 | 1999 | RAM 1500 |
| G41-42945 | D006 | 1999 | CARAVAN |
| G41-42971 | D050 | 1999 | RAM 1500 |
| G41-42972 | D022 | 1999 | RAM 1500 |
| G41-42976 | D024 | 1999 | RAM 1500 |
| G41-42978 | D028 | 1999 | CARAVAN |
| G41-43001 | D030 | 1999 | CARAVAN |
| G41-43002 | D034 | 1999 | CARAVAN |
| G41-43023 | D032 | 1999 | RANGER |
| G41-43024 | D014 | 1999 | RANGER |
| G41-43025 | D011 | 1999 | RANGER |
| G41-43026 | D037 | 1999 | RANGER |
| G41-43027 | D033 | 1999 | RANGER |
| G41-43030 | D052 | 1999 | RANGER |
| G41-43031 | D059 | 1999 | RANGER |
| G41-43034 | D003 | 1999 | RANGER |
| G41-43035 | D004 | 1999 | RANGER |
| G41-43037 | D010 | 1999 | RANGER |
| G41-43038 | D015 | 1999 | RANGER |
| G41-43039 | D002 | 1999 | RANGER |
| G41-43042 | D031 | 1999 | RANGER |

SECTION J
ATTACHMENT 11

PIN/SINN: DAAH23-03-C-0345
MOD/AMD _____
Page 2 of 4

## GSA VEHICLE DENSITY LISTING

| GSA # | TMP # | Year | Model |
|-------|-------|------|-------|
| G41-43046 | D017 | 1999 | RANGER |
| G41-43047 | D008 | 1999 | RANGER |
| G41-43049 | D020 | 1999 | RANGER |
| G41-43050 | D023 | 1999 | RANGER |
| G41-43051 | D061 | 1999 | RANGER |
| G41-43052 | D044 | 1999 | RANGER |
| G41-43053 | D063 | 1999 | RANGER |
| G41-49389 | D013 | 2000 | S10 |
| G41-49394 | D046 | 2001 | RAM 1500 |
| G41-49395 | D040 | 2001 | RAM 1500 |
| G41-49396 | D166 | 2001 | RAM 1500 |
| G41-49403 | D161 | 2001 | RAM 1500 |
| G41-49406 | D128 | 2001 | RAM1500 |
| G41-49441 | D163 | 2001 | RAM1500 |
| G41-49442 | D160 | 2001 | RAM1500 |
| G41-49443 | D168 | 2001 | RAM 1500 |
| G41-49444 | D165 | 2001 | RAM 1500 |
| G41-49445 | D064 | 2001 | RAM 1500 |
| G41-57057 | D007 | 2001 | S10 |
| G41-57087 | D065 | 2001 | WINSTAR |
| G41-65066 | D009 | 2002 | S10 |
| G41-65069 | D025 | 2002 | S10 |
| G41-65074 | D019 | 2002 | S10 |
| G42-39802 | D111 | 2000 | B2500 |
| G42-39803 | D067 | 2000 | B2500 |
| G42-43730 | D114 | 2001 | 1500 |
| G42-43731 | D127 | 2001 | 1500 |
| G42-43734 | D102 | 2001 | 1500 |
| G42-43737 | D066 | 2001 | RAM1500 |
| G42-45174 | D093 | 2001 | 1500 |
| G42-45177 | D133 | 2001 | RAM1500 |
| G42-45198 | D099 | 2001 | 1500 |
| G42-48441 | D081 | 2002 | RAM1500 |
| G42-48462 | D158 | 2002 | C1500 |
| G42-48486 | D159 | 2002 | C1500 |
| G42-80642 | D164 | 1997 | E150 |
| G42-80647 | D110 | 1997 | E150 |
| G43-05263 | D090 | 1999 | RAM 2500 |
| G43-05264 | D092 | 1999 | RAM 2500 |
| G43-05268 | D074 | 1999 | 2500 |
| G43-05284 | D079 | 1999 | RAM 2500 |
| G43-05487 | D094 | 1999 | P30 |
| G43-05495 | D108 | 1999 | 2500 |
| G43-09206 | D072 | 2000 | 3500 |
| G43-09210 | D112 | 2000 | 3500 |
| G43-09221 | D095 | 2000 | P30 |

SECTION J
ATTACHMENT 11

PIN/SINN: DAAH23-03-C-0345
MOD/AMD _____
Page 3 of 4

## GSA VEHICLE DENSITY LISTING

| GSA # | TMP # | Year | Model |
|-------|-------|------|-------|
| G43-14161 | D097 | 2001 | RAM 2500 |
| G43-14166 | D073 | 2001 | F350 |
| G43-20543 | D087 | 2002 | E350 |
| G43-63168 | D096 | 1997 | C3500 |
| G43-67534 | D107 | 1997 | P30 |
| G43-67569 | D071 | 1997 | F250 |
| G43-67570 | D076 | 1997 | F250 |
| G43-67571 | D077 | 1997 | F250 |
| G43-67572 | D078 | 1997 | F250 |
| G43-67573 | D080 | 1997 | F250 |
| G43-67574 | D070 | 1997 | F250 |
| G43-67575 | D075 | 1997 | F250 |
| G43-67576 | D082 | 1997 | F250 |
| G43-67577 | D083 | 1997 | F250 |
| G43-67578 | D068 | 1997 | F250 |
| G43-67580 | D069 | 1997 | F250 |
| G43-67582 | D085 | 1997 | P30 |
| G43-67585 | D084 | 1997 | P30 |
| G43-67586 | D088 | 1997 | P30 |
| G43-67587 | D089 | 1997 | P30 |
| G61-04860 | D134 | 1999 | CHEROKEE |
| G61-08952 | D126 | 2001 | CHEROKEE |
| G61-34843 | D125 | 1997 | CHEROKEE |
| G62-05084 | D129 | 1999 | RAM 1500 |
| G62-26956 | D124 | 1996 | BRONCO |
| G62-29570 | D091 | 1997 | F250 |
| G63-07360 | D113 | 2001 | F350 |
| G63-11633 | D105 | 2002 | K3500 |
| G63-28089 | D104 | 1997 | C3500 |
| G63-28091 | D103 | 1997 | C3500 |
| G63-28092 | D106 | 1997 | C3500 |
| G63-28093 | D109 | 1997 | C3500 |
| G63-28095 | D101 | 1997 | C3500 |
| G63-28096 | D098 | 1997 | C3500 |
| G63-30151 | D100 | 1997 | F350 |
| G71-00018 | D119 | 1998 | F-800 |
| G71-00021 | D121 | 1998 | F-800 |
| G71-00023 | D120 | 1998 | F-800 |
| G71-00026 | D122 | 1998 | F-800 |
| G71-00027 | D116 | 1998 | F-800 |
| G71-00028 | D115 | 1998 | F-800 |
| G71-00552 | D130 | 2000 | C6500 |
| G71-01215 | D177 | 2001 | S&P |
| G71-01824 | D178 | 2003 | 4200 S & P |
| G71-17367 | D117 | 1998 | F-800 |
| G71-17368 | D176 | 1998 | F-800 |

Case 1:06-cv-00783-WKW-TGC   Document 24-3   Filed 06/04/2007   Page 21 of 57

SECTION J
ATTACHMENT 11

PIN/SINN: DAAH23-03-C-0345
MOD/AMD _____

Page 4 of 4

## GSA VEHICLE DENSITY LISTING

| GSA # | TMP # | Year | Model |
|---|---|---|---|
| G71-17369 | D118 | 1998 | F-800 |
| G71-17376 | D170 | 1998 | F-800 |
| G71-17743 | D123 | 2002 | 4700 |
| G82-00050 | D132 | 1992 | F900 T/T |
| G82-01986 | D400 | 1990 | 7100 4X2 |
| G90-01420 | D131 | 1991 | WRECKER |
| G91-04543 | D406 | 1994 | 28'F/BED S&P |

# PLAINTIFF'S

# EXHIBIT B

**DeFrank v. Army Fleet Support, L.L.C.; Case No. 1:07-cv-775-WKW**

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

SOUTHERN DIVISION


CHRISTINE BENNETT,            )

       Plaintiff,         )

vs.                          )    CASE NUMBER:

ARMY FLEET SUPPORT,          )    1:06-CV-723-MHT

LLC,                         )

       Defendant.          )


DEPOSITION OF JOHN LEROY HAMLIN

In accordance with Rule 5(d) of

The Alabama Rules of Civil Procedure, as

Amended, effective May 15, 1988, I, Cindy

Weldon, am hereby delivering to Ethan

Dettling, the original transcript of the

oral testimony taken on the 21st day of

June, 2007, along with exhibits.

Please be advised that this is the

same and not retained by the Court Reporter,

nor filed with the Court.

1     Q.   I believe that the property

2 furnished by the Government is listed in

3 documents that were attached to your

4 affidavit?

5     A.   That's correct.

6     Q.   That's correct.  And what I'm

7 going to hand you with a binder clip on it

8 is, I believe, a list of Government

9 furnished equipment; is that correct?

10         MR. SHAW:  I think -- go ahead and

11 answer.

12    A.   Yes, it is.

13         MR. SHAW:  And there's some other

14 things in here, too.

15         MR. DUTTLING:  Right.

16    Q.   There's also some provisions

17 pertaining to Government furnished

18 equipment; is that correct?

19    A.   That's correct.

20    Q.   There's also real property that is

21 furnished by the Government for AFS's use;

22 is that also correct?

23    A.   Yes, it is.

1      Q.   Does AFS pay any rent to the

2 United States Government for the use of that

3 real property?

4      A.   No, they do not.

5      Q.   Does AFS pay any rent to the U.S.

6 Government for the use of any personal

7 property?

8      A.   I'm not sure what you mean by

9 personal property.

10      Q.   Sure.  Property other than real

11 property.

12      A.   There are vehicles.  There are

13 tools.  There are facilities and the

14 aircraft.  AFS does not pay a fee or

15 anything for those.

16      Q.   So although those things aren't

17 provided by the Government but AFS has

18 actually received those items for their use,

19 there's not been any fee or rent charged to

20 AFS for any of those items?

21      A.   It's not for AFS's use.  It's to

22 support the contract for the Government.

23      Q.   Well, does AFS use the items that

1 on here that say how many it is.  But do you

2 have an idea how many vehicles are provided

3 by the Government?

4      A.   Several hundred.

5      Q.   There are cars among them?

6      A.   No, there are no cars.

7      Q.   There are trucks?

8      A.   Yes, there are.

9      Q.   But light trucks, pickups?

10      A.   Primarily the pickup trucks.

11 There are a few heavy vehicles such as an

12 eighteen wheeler, a wrecker for the heavy

13 vehicles.  And then there are carts made by

14 Kawasaki.

15      Q.   It appears there may be a few

16 sport utility vehicles?

17      A.   There are vans.

18      Q.   There are vans?

19      A.   Yes.

20      Q.   And are those Kawasaki?  Is that

21 what you said?

22      A.   Yes.

23      Q.   Are those carts listed on the

1 attachment 11 in this four page attachment?

2     A.    I'd have to look and see.

3     Q.    I don't know.  I didn't see

4 anything that looked like that.  I don't

5 know.

6     A.    It doesn't look like they are

7 listed on that attachment.

8     Q.    Do you know how many of those

9 carts are provided?

10     A.    At least one hundred.

11     Q.    Is the fuel for all of those

12 vehicles also provided by the Government?

13     A.    Yes, it is.

14     Q.    Is the maintenance for the

15 vehicles provided by the Government?

16     A.    Yes and no.  The basic service for

17 the vehicles is part of the general services

18 administration for the trucks, vans, those

19 types of vehicles.  The Kawasaki vehicles

20 are maintained by AFS employees.

21     Q.    Now, a moment ago you mentioned

22 there are several hundred motor vehicles

23 furnished by the Government?

1 manuals that are hard copy.  The Army is

2 moving more and more to automated electronic

3 systems.

4      Q.   In other words, a change that the

5 Army is in the process of implementing?

6      A.   Yes, it is.

7      Q.   Are there library materials and

8 publications available for ASF's use?

9      A.   Yes.

10      Q.   Government published materials?

11      A.   Yes, sir.

12      Q.   Does the Government charge any fee

13 for the use of those materials?

14      A.   They do not.

15      Q.   Or the reproduction of those

16 materials?

17      A.   They do not.

18      Q.   Does the Government provide all

19 copying services required for the contract,

20 photo copying services?

21      A.   Yes.  AFS owns one copier that we

22 have purchased.

23      Q.   Did the Government reimburse for

1    Q.    When such training is provided,

2 who actually does the training?

3    A.    It's either done by Government

4 employees, active duty military or another

5 Government subcontractor.    There is

6 follow-up training that is done by AFS

7 employees.

8    Q.    In other words, the AFS employees

9 who are initially trained can then become

10 trainers themselves?

11    A.    That is correct.

12    Q.    You said primarily for new

13 equipment training?

14    A.    Yes.

15    Q.    What other forms of training are

16 provided by the Government?

17    A.    New programs that are introduced

18 that the Government desires us to do.    An

19 example would be lean implementation.

20    Q.    L-E-A-N?

21    A.    Yes, L-E-A-N.

22    Q.    What is lean implementation?

23    A.    It's primarily a process to reduce

1 waste, to become more efficient, more

2 productive in the work place.

3     Q.   Is it a management philosophy?  Is

4 that what that is?

5     A.   Basically it's an all employee

6 philosophy, from the senior person in the

7 company to the hourly employees.

8     Q.   You gave that as an example?

9     A.   Yes.

10     Q.   Is that something that actually

11 did happen?

12     A.   It's ongoing.

13     Q.   Who provides the training for the

14 lean implementation?

15     A.   It's been provided by several

16 organizations.  Primarily subcontractors and

17 also by some Government employees and AFS

18 employees who are training trainers.

19     Q.   And this training is provided free

20 of charge --

21     A.   Yes.

22     Q.   -- through AFS?  Have you received

23 training yourself?

1      A.    I have.

2      Q.    With the -- And specifically

3 pertaining to this lean implementation?

4      A.    Yes, I have.  I received training

5 through the University of Tennessee in

6 Knoxville, Tennessee.  Forty hours

7 instruction.

8      Q.    And who else with AFS received

9 similar training along with you at the

10 University of Tennessee?

11     A.    There probably have been around

12 twenty-five to thirty employees.

13     Q.    Of AFS?

14     A.    Of AFS.

15     Q.    And how long or over what period

16 of time did you receive the forty hours of

17 instruction?

18     A.    One week.

19     Q.    Did you stay in Knoxville during

20 that week?

21     A.    Yes.

22     Q.    Were the costs associated with

23 your stay in Knoxville born by the

1 Government?

2      A.   Yes.

3      Q.   Do you know or is there any

4 particular program or department within the

5 University of Tennessee that provided the

6 lean training?

7      A.   Yes, there is.  I don't recall the

8 exact title of that department.

9      Q.   Is it within their school of

10 business?

11      A.   Yes, it is.

12      Q.   Is this lean program a program

13 that is used by many different types of

14 corporations?

15      A.   Yes, it is.

16      Q.   During your forty hours of

17 instruction at the University of Tennessee,

18 were there managers or employees of other

19 companies who were also there receiving

20 training at the same time?

21      A.   Yes, there were.

22      Q.   Did you meet anyone in particular

23 who worked for a company that you can

1 recall?

2     A.   I don't recall their names.   There

3 were people from a number of other defense

4 contractors there as well as Government

5 employees and some active duty military

6 persons there.

7     Q.   Do you know if this same course of

8 instruction is also used, for example, for

9 non-military contractor companies?

10     A.   Yes, it is.

11     Q.   Were any -- To your knowledge,

12 were any people that received the training

13 at the same time as you people from

14 non-Government contractor companies?

15     A.   Yes, there were.

16     Q.   I'm just thinking, you know,

17 anything from auto manufacturers to a

18 company that sells computers, if you run the

19 gambit, isn't that true?

20     A.   Yes.

21     Q.   Was the training that you received

22 useful to you?

23     A.   Yes, it was.

1    Q.    In what way?

2    A.    To become a more effective

3 manager, to identify processes and

4 procedures that could be streamlined or

5 eliminated or made more efficient.

6    Q.    And do you know if the lean

7 training has been beneficial to other

8 members of AFS management?

9    A.    Yes, it has.

10    Q.    Is that something that you have

11 seen tangible results for yourself?

12    A.    Yes, I have.

13    Q.    Has AFS attempted to explore other

14 business opportunities?

15    A.    Yes, we have.

16    Q.    And tell me about those.

17    A.    There was a Fort Rucker contract

18 for flight operations which managed the

19 flight operations air traffic control

20 organizations at Fort Rucker.  We partnered

21 with another company called V.T. Griffin.

22    Q.    Is that a B as in baby?

23    A.    As in V, Victor Tango Griffin.

1      Q.    I'm sorry.   I interrupted you.

2      A.    We submitted a proposal along with

3 other bidders.   The Government opted to keep

4 the program in-house with Government active

5 duty in place, in-house.   They decided not

6 to release a contract to any of the bidders.

7      Q.    It was a function the Government

8 was providing for itself?

9      A.   Yes.

10      Q.    Through its own employees and it

11 decided to continue to do that?

12      A.   Yes.

13      Q.    What other business opportunities

14 has AFS explored?

15      A.    AFS is continuing to look at

16 opportunities that would grow our business

17 that are ongoing.

18      Q.    Would identifying any of those

19 other opportunities create a problem for

20 AFS?

21      A.    Those opportunities that are

22 within the scope of the contract that

23 supports the government's contract here --

1    Q.   Here at Fort Rucker?

2    A.   Here at Fort Rucker -- there's not

3 a problem.

4    Q.   You would not want to disclose

5 them for proprietary reasons?

6    A.   For those opportunities we're

7 exploring external to this contract.

8    Q.   Fair enough.  Suffice it to say,

9 AFS is exploring opportunities outside the

10 realm of Fort Rucker?

11    A.   Yes.

12    Q.   Do AFS management meet separately

13 to discuss future goals and plans for AFS?

14    A.   Yes.

15    Q.   And how often do those meetings

16 occur?

17    A.   There's no set schedule.

18    Q.   I see.  Would you say that such

19 meetings occur on a monthly basis?

20    A.   No.

21    Q.   On a quarterly basis?

22    A.   It would depend on when the

23 opportunity presents itself.  In other

1 could take with you to another job with

2 another company?

3     A.   Yes, it is.

4     Q.   And you would be a better manager

5 for it?

6     A.   Yes.

7     Q.   Other than the forty hours of

8 instruction in the lean implementation, did

9 you receive other additional training in the

10 lean program?

11    A.   Yes, I have.

12    Q.   How much more?

13    A.   I couldn't quantify.  It's been

14 with AFS employees that have gone to other

15 lean programs and been trained and as part

16 of the train the trainer process.

17    Q.   Were those programs conducted

18 offsite, the training programs?

19    A.   Some of them.  The majority were

20 onsite.

21    Q.   Where offsite has training

22 occurred?

23    A.   Montgomery, Alabama.  And there

1    Q.   Were you one of those?

2    A.   I was not.

3    Q.   Would you agree with me, based on

4 your testimony a few moments ago, that the

5 lean training has benefits to AFS far beyond

6 the contract at Fort Rucker?

7         MR. SHAW:  Object to the form of

8 the question.

9    Q.   You can answer that.

10   A.   I'm not sure what you mean by far

11 and beyond.

12   Q.   If you continue to work for AFS

13 and AFS has a contract in a different

14 location, would your lean training come with

15 you?

16   A.   Yes.

17   Q.   It'll follow you virtually

18 anywhere you go from now, won't it?

19   A.   Yes.

20   Q.   And that's true for all the

21 managers of AFS that have received the lean

22 training?

23   A.   It depends on the individual

Page 55

1 you were employed by Dell?

2      A.   Yes.

3      Q.   Is new equipment training provided

4 to AFS by the Government?

5      A.   Yes.

6      Q.   What -- If you know, what new

7 equipment has the Government provided

8 training for?

9      A.   The Black Hawk helicopter they

10 refer to as a UH 60 M Mic Mach (spelled

11 phonetically).

12      Q.   Are both of those aircraft?

13      A.   It's one aircraft.

14      Q.   And what about any other new

15 equipment training?

16      A.   We are providing training for --

17 on the Chinook helicopter for the CH 47 D.

18 And that will also transition to the CH 47

19 F.

20      Q.   F as in Fred?

21      A.   Yes.

22      Q.   C-H-I-N-O-O-K?

23      A.   Yes.  Also for new computer

1 the proper way of cleaning an environment

2 that has some type of hazard in it or just

3 the use of any type of hazard materials such

4 as a cleaning product.

5     Q.    You're talking about like haz-mat

6 training?

7     A.    Yes.

8     Q.    There was some testimony yesterday

9 that the Equal Employment Opportunity

10 Commission conducted free training for AFS's

11 management.  Are you aware of that?

12    A.    No, I'm not.

13    Q.    Are you aware of any requirement

14 in the proposal or contract that the EEOC

15 provide free training to AFS's management?

16    A.    I'm not.

17    Q.    There was also testimony yesterday

18 that there were some health and wellness

19 training for AFS's employees.  Are you aware

20 of that?

21    A.    There are health and wellness

22 fairs.  I wouldn't classify it as training.

23    Q.    So do you know whether courses or

Page 58

1 seminars are given in connection with the,

2 as you put it, fairs?

3      A.    There's a smoking cessation

4 program that could consist of seminars or

5 awareness training of the hazards of

6 smoking.

7      Q.    Have you gone to any of those

8 fairs yourself?

9      A.    Yes, I have.

10      Q.    How many times?

11      A.    At least five times.

12      Q.    Are you aware of any instruction

13 provided in connection with the health and

14 wellness fairs regarding methods to reduce

15 stress?

16      A.    There is advice or pamphlets that

17 are handed out.

18      Q.    Are some of those pamphlets

19 Government published?

20      A.    Not to my knowledge.

21      Q.    Are civilian Department of Defense

22 employees involved in providing any

23 instruction or training in connection with

Page 59

1 the health and wellness fairs?

2      A.    There are people from the Soldier

3 Support Center there that may or may not be

4 Government employees.  They would provide

5 the same material in terms of handouts or

6 advice or whatever it would be to the

7 employee.

8      Q.    Government Support Center, is that

9 a center that is owned and operated by the

10 United States military?

11      A.    It's a central building, if you

12 will, with a number of centralized offices

13 at Fort Rucker that's maintained by the

14 Government.

15      Q.    Is there any provision in the --

16 or any bid proposal or contract that

17 requires Army Fleet Support employees to

18 participate in health and wellness fairs?

19      A.    No.

20      Q.    Do you know if any classes are

21 taught through the Soldier Support Center?

22      A.    There are classes available to all

23 active duty Government employees and

Page 70

1      A.   I did.

2      Q.   The first paragraph of this policy

3 states Army Fleet Support is a Government

4 contractor and is therefore subject to the

5 provisions of the Americans with

6 Disabilities Act of 1990, comma, the

7 Rehabilitation Act of 1973, comma, and the

8 Vietnam Era Veterans Readjustment Assistance

9 Act of 1974, period.

10     A.   Yes.

11     Q.   Is Exhibit 10 a policy that you

12 approved?

13     A.   Yes, it is.

14     Q.   What is Exhibit 10?  What policy

15 is it?

16     A.   You have policies within our human

17 resources department for their policies and

18 procedures that pertain to the affirmative

19 action program.

20     Q.   And what affirmative action has

21 AFS taken to provide equal opportunity for

22 disabled applicants and/or employees?

23          MR. SHAW:  Object to the form of

# PLAINTIFF'S

# EXHIBIT C

**DeFrank v. Army Fleet Support, L.L.C.; Case No. 1:07-cv-775-WKW**

ARMY FLEET SUPPORT (AFS) LLC
AFS-M-0118
Policy Manual
Approved by: John Hamlin

Page          25 of 47
Effective Date:  020103
Revision Date:   New

## POLICY 14  DISABLED EMPLOYEES - VIETNAM ERA VETERANS, DISABLED VETERANS

Army Fleet Support is a government contractor and is therefore subject to the provisions of the Americans with Disabilities Act of 1990, the Rehabilitation Act of 1973, and the Vietnam Era Veterans Readjustment Assistance Act of 1974.

These acts require all government contractors to take affirmative action to employ and advance in employment qualified individuals covered by these laws.

To accomplish this, the Company must first know who our qualified disabled employees are, who our qualified disabled veterans are, and who our Vietnam era veterans are.  Such information will be kept confidential but will aid us in identifying the employee and providing consideration or accommodations for employment opportunities.  Therefore, you are invited to notify your Personnel office if you fall in one or more of the following categories:

Disabled  - Any qualified person who (1) has a physical or mental impairment which substantially limits one or more of such person's major life activities; (2) has a record of such impairment or (3) is regarded as having such an impairment.

Vietnam Era Veteran – Any person who served on active duty for a period of more than 180 days, any part of which occurred between August 5, 1964 and May 7, 1975.

Disabled Veteran – Any person who is entitled to disability compensation under laws administered by the Veterans Administration for disability rated at 30 percent or more, or a person whose discharge or release from active duty was for a disability incurred or aggravated in the line of duty.

If you fall in one or more of these categories and have not previously identified yourself as such, you may visit the Personnel Section, located in Donnell Shopping Center, Daleville, weekdays during the hours of 0700 – 1530, or you may call 598-0418 and identify yourself for inclusion in the Company's personnel records for affirmative action consideration.

Submission of this information is voluntary, and refusal to provide it will in no way deny you consideration for any job for which you are qualified.

Last Printed 12/6/20068:47 AM.
Distribution of this document is via Intranet.  See documentation revision history for latest revision to ensure document is current.  The revision number at the top of this page must be the same as shown on the revision history at the front of each manual.

AFS1656

# PLAINTIFF'S

# EXHIBIT D

**DeFrank v. Army Fleet Support, L.L.C.; Case No. 1:07-cv-775-WKW**

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

SOUTHERN DIVISION


CHRISTINE BENNETT,          )

      Plaintiff,          )

vs.                         )   CASE NUMBER:

ARMY FLEET SUPPORT,         )   1:06-CV-723-MHT

LLC,                        )

      Defendant.          )


DEPOSITION OF AMELIA DARLENE WHELAN

      In accordance with Rule 5(d) of

The Alabama Rules of Civil Procedure, as

Amended, effective May 15, 1988, I, Cindy

Weldon, am hereby delivering to Ethan

Dettling, the original transcript of the

oral testimony taken on the 20th day of

June, 2007, along with exhibits.

      Please be advised that this is the

same and not retained by the Court Reporter,

nor filed with the Court.

1      Q.    How often would you say that the

2 U.S. military provides AFS with new

3 equipment training?

4      A.    Probably two or three times a

5 year.  We also work with the Soldier

6 Center.  They have health and wellness

7 programs.  And their employees will provide

8 sessions to various groups on our contract

9 on stress management, health and wellness,

10 exercise fitness, eating well, all of this.

11 They typically will participate with us in

12 health and wellness days quarterly.

13      Q.    Health and wellness days?

14      A.    We have a day that's set up at

15 each location for the year.  But we make

16 rounds quarterly at the various locations.

17 We just make sure they are all covered

18 within a year.

19            And we'll have a special day set

20 up that goes over the latest safety trends,

21 safety equipment, wellness trends.  We also

22 offer educational material, you know,

23 vendors, outside vendors that will come in

1 to it as a location.  And -- because

2 sometimes it will be an Air Force location

3 or the Army location at Lowe.

4      Q.   It's a more specific term?

5      A.   That's correct.

6      Q.   Is this health and wellness

7 training offered by the United States

8 military?

9      A.   It's offered by the company.

10     Q.   Is it -- You mentioned a Soldier

11 Center.  What is the Soldier Center?

12     A.   The Soldier Center performs a

13 variety of functions for the military.

14 That's where they do a lot of processing,

15 where you get your decals for your

16 vehicles.

17          And one portion of that, they have

18 a health and wellness office.  When we have

19 our health and wellness days, that's when we

20 work with them to get them in with some of

21 their materials so that they can provide

22 that, because like I said earlier, we do

23 have a large base of employees that have a

1 military connection.

2         So we want to make sure that they

3 are aware of the different things that the

4 Soldier Center can provide to military

5 personnel.

6     Q.   And the Soldier Center itself is a

7 military --

8     A.   It's a military facility.

9     Q.   Facility?

10    A.   Uh-huh.

11    Q.   Do military personnel assist in

12 the -- Well, do the military personnel

13 provide training regarding things like you

14 mentioned, stress management, exercise,

15 fitness, diet during your health and

16 wellness days?

17    A.   I know there are military that

18 coordinate it.  But the actual instructors I

19 think are DOD.

20    Q.   Department of Defense instructors?

21    A.   That's correct.

22    Q.   And you'll have to forgive my

23 ignorance about the differences between the

1 Army and the DOD.  What does that mean that

2 they are DOD employees?

3       A.   They are civilian employees.

4       Q.   Of the Department of Defense?

5       A.   That is correct.

6       Q.   Is the health and wellness

7 training done by DOD employees done free of

8 charge to ASF?

9       A.   All of their services are free of

10 charge.

11      Q.   Do ASF employees -- I assume that

12 you have employees that participate in these

13 programs?

14      A.   In the --

15      Q.   In the health and wellness program

16 or days?

17      A.   In the health and wellness days,

18 yes.

19      Q.   Other than the health and wellness

20 days, is there other training provided by

21 DOD employees?

22      A.   Not that I'm aware of.

23      Q.   Is it correct that some of the

1    A.    Correct.  Or I would call them.

2    Q.    When you say call them, do you

3 mean you would call the EEOC?

4    A.    That is correct.

5    Q.    Who would you call or where would

6 you call?

7    A.    Well, we had over the span of --

8 and I can't tell you how many months or

9 years -- the contract had established

10 various contacts through visits.

11         We have some of the EEOC

12 representatives that would come and provide

13 seminars to employees.  They give us their

14 business cards and they provide assistance

15 to us whenever we need it.

16    Q.    How often would the Equal

17 Employment Opportunity Commission provide

18 seminars to AFS employees?

19    A.    They come out I think twice a

20 year.

21    Q.    Has that been the case since

22 you've been employed with AFS?

23    A.    No.  That was a program that I

Page 54

1 recall their names.

2      Q.   Was AFS charged for seminars

3 provided by the Equal Employment Opportunity

4 Commission?

5      A.   No.   That's a free service they

6 provide to every one.

7      Q.   And have they -- strike that.   Has

8 the EEOC provided seminars or training twice

9 a year since the date you first became

10 director of human resources?

11      A.   The first time -- I don't recall

12 the date that it began.   So that would

13 really -- it would be difficult to say twice

14 a year every year since they started.   I

15 don't recall during that first time frame

16 how many months were in that year.

17           And I may have been in

18 coordination with them at the end of the

19 year.   They didn't start the program

20 instruction until the following year.

21      Q.   Is it possible that in some years

22 it was more than twice a year?

23      A.   It may have been.

# PLAINTIFF'S

# EXHIBIT E

**DeFrank v. Army Fleet Support, L.L.C.; Case No. 1:07-cv-775-WKW**

# Fort Rucker

## Physical Fitness Center

**ARMY FLEET SUPPORT**

### Contractor Employee Rules

(This is a 90-day trial basis that may end on 31 Oct 06.)

• The Center is open for service from 0500 to 2100 every week day. Peak hours for active duty military are usually 0500 to 0700 each morning. Active duty military will be given priority to all equipment at any times.

• Closed-toe shoes must be worn, no denim is allowed, and appropriate and conservative outfits are to be worn at all times or you will be asked to leave the facility.

• Bring your own towels for personal use. Center towels will not be available due to present shortages.

• Family members are not allowed in the facility. Contractor employees must bring their badge, and know their social security number.

• An indoor pool will be open to contractor employees Monday through Friday, 0530 – 0730 and 1600 – 1900.

• Three racquetball courts and one squash ball court are available. Courts will not be reserved every week by the same individuals. Courts must be reserved 8 hours prior to requested use.

• Steam rooms and saunas are located in all locker rooms.

# PLAINTIFF'S

# EXHIBIT F

**DeFrank v. Army Fleet Support, L.L.C.; Case No. 1:07-cv-775-WKW**

**From:**    Gee, Lisa
**Sent:**    Wednesday, February 14, 2007 11:49 AM
**To:**    All Management; Admin Specialists; Personnel Specialists
**Subject:** Fitness Center Rules

Good Morning,

Please share the following information with all employees.

We are happy to hear that many AFS employees are taking advantage of the fitness facilities on post.   And for the most part, everyone has been following the rules and regulations for these facilities.

However, it has come to our attention that a few AFS employees using the fitness centers on post are not wearing the proper attire required for working out at the facilities.  The Fort Rucker Physical Fitness Center rules clearly state that **"closed-toe shoes must be worn, no denim is allowed, and appropriate and conservative outfits are to be worn at all times or you will be asked to leave the facility."**

**Please remember, this is a privilege, and like all privileges, it too can be taken away if we don't abide by the rules.  As a reminder, the flyer with the "Contractor Employee Rules for the Fort Rucker Physical Fitness Center" is attached.**

Thank you for your cooperation.

Lisa M. Gee
**ARMY FLEET SUPPORT**
Public Relations & Communications
Direct:  (334) 503-3559
Mobile: (334) 498-1027
geel@frmaint.com

# PLAINTIFF'S

# EXHIBIT G

**DeFrank v. Army Fleet Support, L.L.C.; Case No. 1:07-cv-775-WKW**

```
 1        IN THE UNITED STATES DISTRICT COURT FOR THE

 2               MIDDLE DISTRICT OF ALABAMA

 3                    SOUTHERN DIVISION

 4

 5

 6

 7   PAULA F. DeFRANK,              )

 8           Plaintiff,            )

 9   vs.                          )   CASE NO.:

10   ARMY FLEET SUPPORT, LLC,  )   1:07cv775-WKW

11           Defendant.           )

12

13

14

15

16

17        The deposition of LOWELL A. GREEN, JR.,

18   taken pursuant to the Alabama Rules of Civil

19   Procedure before Tina L. Harrison, Court Reporter

20   and Notary Public, State at Large, at Court

21   Reporting Associates, Inc., 256 Honeysuckle Road,

22   Suite 23, Dothan, Alabama, on the 2nd day of April,

23   2008, commencing at approximately 2:20 p.m.
```

ORIGINAL

1    Q.    And what's your current rank?

2    A.    Major.

3    Q.    And how many years do you have in?

4    A.    19.

5    Q.    Do you have any relatives that work at

6    Army Fleet Support?

7    A.    No, sir.

8    Q.    How long did you work as a supervisor on

9    the Longbow?

10   A.    Approximately around four years, that

11   time frame right there.

12   Q.    Okay.  So up to about 2003?

13   A.    Yes, sir.

14   Q.    Did you receive any training while you

15   were a supervisor during that time period from '99

16   to 2003?

17   A.    On the Longbow?

18   Q.    Yeah.

19   A.    Yes, sir.

20   Q.    What type of training did you receive?

21   A.    I was sent to Boeing to the -- where

22   they build the Apache at in Mesa, Arizona.  I went

23   over there.  Went to the avionics course there and

1  then came back in -- Boeing came to Fort Rucker,

2  and I went through training with Boeing here at

3  Fort Rucker.

4      Q.    Okay.  And just to be sure I'm clear in

5  my mind, when Boeing came to Fort Rucker, did they

6  come and do some additional training or did you

7  train for them or with them?

8      A.    It was a different -- when I went to

9  Mesa, it was an avionics course.  And when they

10  came here to Fort Rucker, it was the maintainers

11  course and the mechanics course.

12      Q.    And the Longbow is a variation of the

13  Apache?

14      A.    Yes, sir.

15      Q.    Any other type of training that you

16  received?

17      A.    Through the company?

18      Q.    Through the company or otherwise.

19      A.    I've been -- six sigma, lean training.

20      Q.    What is sigma training?

21      A.    It's just a process in development

22  courses, more efficient for business practices.

23      Q.    Okay.  General management training?

1      A.     Yes, sir.

2      Q.     And the lean training, is that general

3  management training?

4      A.     It's eliminating waste, more efficiency,

5  cleaning your work areas up and stuff.  It's a big

6  thing the Army is pushing right now.

7      Q.     It sounds like something we could all

8  use.  Any other type of training?

9      A.     Some ISO training.  No major training.

10  No.

11      Q.     Have you ever received any training in

12  the personnel area of personnel relations?

13      A.     Not any formal training.  No, sir.

14      Q.     Have you ever received any training on

15  the Americans with Disabilities Act or the

16  Rehabilitation Act?

17      A.     No, sir.

18      Q.     Do you by any chance have a service-

19  connected disability of any kind?

20      A.     No, sir.

21      Q.     After you worked as a supervisor on the

22  Longbow, what was your next assignment?

23      A.     General foreman.

# PLAINTIFF'S

# EXHIBIT H

DeFrank v. Army Fleet Support, L.L.C.; Case No. 1:07-cv-775-WKW

1

1    IN THE UNITED STATES DISTRICT COURT FOR THE

2    MIDDLE DISTRICT OF ALABAMA

3    SOUTHERN DIVISION

4

5

6

7    PAULA F. DeFRANK,              )

8            Plaintiff,            )

9    vs.                          )    CASE NO.:

10   ARMY FLEET SUPPORT, LLC,     )    1:07cv775-WKW

11           Defendant.            )

12

13

14

15

16

17          The deposition of RONALD VICTOR FARRINGTON

18   taken pursuant to the Alabama Rules of Civil

19   Procedure before Tina L. Harrison, Court Reporter

20   and Notary Public, State at Large, at Court

21   Reporting Associates, Inc., 256 Honeysuckle Road,

22   Suite 23, Dothan, Alabama, on the 2nd day of April,

23   2008, commencing at approximately 1:17 p.m.

**ORIGINAL**

1    immediate supervisor?

2       A.    Yes.

3       Q.    Could you tell me about that training?

4       A.    Safety, lean -- lean training.

5       Q.    Safety training, what was that -- who

6    did that and what was it about?

7       A.    Our safety portion of our company.

8    Their representatives came out to the field, and we

9    also went to classes on post -- main post.

10    Everybody.  And I was part of that training.

11       Q.    What areas of safety were addressed?

12       A.    Fall protection, flight line safety, all

13    aspects of the safety realm.

14       Q.    Accident prevention and --

15       A.    Yes, sir.

16       Q.    -- that sort of thing?  And what was the

17    other training?  You said lead or lean?

18       A.    Lean training.

19       Q.    Lean training?

20       A.    Yes, sir.

21       Q.    What was that?

22       A.    In a nutshell, lean out a process that

23    you're doing out there on the flight line, make it

# PLAINTIFF'S

# EXHIBIT I

DeFrank v. Army Fleet Support, L.L.C.; Case No. 1:07-cv-775-WKW

1      IN THE UNITED STATES DISTRICT COURT FOR THE

2            MIDDLE DISTRICT OF ALABAMA

3                SOUTHERN DIVISION

4

5

6

7      PAULA F. DeFRANK,              )

8            Plaintiff,              )

9      vs.                           )   CASE NO.:

10     ARMY FLEET SUPPORT, LLC,  )   1:07cv775-WKW

11           Defendant.             )

12

13

14

15

16

17         The deposition of PAULA DeFRANK taken

18     pursuant to the Alabama Rules of Civil Procedure

19     before Tina L. Harrison, Court Reporter and Notary

20     Public, State at Large, at Court Reporting

21     Associates, Inc., 256 Honeysuckle Road, Suite 23,

22     Dothan, Alabama, on the 27th day of March, 2008,

23     commencing at approximately 9:00 a.m.

COPY

1   then the second page is requirements specifically

2   for the job of aircraft mechanic.

3       A.     Okay.

4       Q.     If you would, let's look at that second

5   and third pages of that.  Take a minute and read

6   over that.  And my question is, Does this

7   adequately describe the duties of an aircraft

8   mechanic at Army Fleet Support when you were

9   employed there or when you were active there?

10      A.     Yes.

11      Q.     Now, when you -- Army Fleet Support

12  actually began its contract with the Army on

13  December 1st of 2003.  And you were an employee of

14  Army Fleet Support from the outset; is that right?

15      A.     Yes.

16      Q.     What did you do from December the 1st of

17  '03 until your automobile accident in early January

18  of '04?

19      A.     As far as I can remember, I've been

20  doing parts turn-in at the aircraft parts turn-in.

21      Q.     During that month of December of '03,

22  you did not actually work as a mechanic out on the

23  helicopters?

1   there just months or years?

2       A.    I worked with the company --

3       Q.    No.  I'm talking about as an aircraft

4   mechanic on helicopters.

5       A.    I don't remember the ending date.

6       Q.    Well, can you give me some approximation

7   of how long you worked on the helicopters?

8       A.    No.  I'm not sure of the -- still not

9   sure of the ending date.

10      Q.    Would it be in terms of months or years

11  or weeks?

12      A.    Months.

13      Q.    Do you think it was less than 12 months?

14      A.    It's hard to say.  I still don't

15  remember the --

16      Q.    Would it have been less than 24 months?

17      A.    Yes.

18      Q.    Then what did you do for DynCorp the

19  rest of the time you were employed by DynCorp?

20      A.    The aircraft parts turn-in.

21      Q.    Were there any breaks in your active

22  work at DynCorp?

23      A.    Breaks as in?

1    you began your employment there at Army Fleet

2    Support but in June of 2006, when you last applied

3    to return to work at Army Fleet Support?

4        A.    I'm not sure of the question.

5        Q.    Okay.  Would these essential duties and

6    responsibilities be the same in June of 2006?

7        A.    Yes.

8        Q.    Now, you told me earlier that you began

9    working at Army Fleet Support December 1st of 2003,

10   and I think you said you worked at parts turn-in

11   during that month of December; is that right?

12       A.    The month of December of what year?

13       Q.    Of '03.

14       A.    Did I physically work for AFS?  Is that

15   what you're asking?

16       Q.    Well, yes.

17       A.    I'm not sure of the question.

18       Q.    Well, I mean, you were employed by AFS

19   during the month of December, were you not?

20       A.    Yes.

21       Q.    All right.  What job did you perform?

22       A.    Aircraft -- maintenance -- I was

23   doing -- I was employed as an aircraft mechanic,

1    but I was doing parts turn-in.

2         Q.    And was this on the Apache?

3         A.    Yes -- well, what year again, please?

4         Q.    2003, when you first started work for

5    Army Fleet Support.

6         A.    Yes, it was on the Apache.

7         Q.    So did you just continue doing what you

8    had been doing at DynCorp prior to their departure?

9         A.    Yes.  I carried over into Army Fleet

10   Support.

11        Q.    Now, you were injured in a car accident

12   in January of 2004?

13        A.    Yes.

14        Q.    What was the nature of your injuries?

15        A.    I suffered neck and my back and

16   shoulder.

17        Q.    Okay.  Which shoulder?

18        A.    Right shoulder.

19        Q.    And I think you were off from work at

20   Army Fleet Support there until sometime in May of

21   2004.  Is that your recollection?

22        A.    Would you give me the dates again,

23   please?  2004?

1      Q.    The same year of the accident?

2      A.    Yes.

3      Q.    Did you have any surgery growing out of

4    that accident?

5      A.    Yes.

6      Q.    Do you recall when that was?

7      A.    In August.

8      Q.    I think -- now that you say that, I

9    think I recall you actually returned -- according

10   to the records here, you returned to work at the

11   end of June of 2004 and worked through July and

12   into August until you had your surgery.  Do you

13   recall the date of your surgery?

14     A.    It was August 2004.

15     Q.    Okay.  What was the nature of your

16   surgery, again?

17     A.    I had a surgical fusion in my neck.

18     Q.    Between what discs?

19     A.    C6 and 7.

20     Q.    During the time that you returned to

21   work prior to your surgery, the time you returned

22   to work for Army Fleet Support, what did you do?

23     A.    Aviation parts turn-in, the parts turn-

1   in.

2        Q.    And on what aircraft?

3        A.    The Apache.

4        Q.    Were you the sole person doing the parts

5   turn-in on the Apache on your shift?

6        A.    I do not remember at that time if anyone

7   else was with me or not.

8        Q.    Okay.

9

10        (Whereupon, Defendant's Exhibit 3 was

11        marked for identification and same is

12        attached hereto.)

13

14        Q.    Ms. DeFrank, I'm handing you what's been

15   marked as Defendant's Exhibit 3.  Do you recognize

16   this as being the doctor slip you got from

17   Dr. Dorchak and then the return to work slip that

18   accompanied that that was made out by Army Fleet

19   Support for your return in June of 2004?

20        A.    Yes.

21        Q.    And these restrictions that are on the

22   return to work slip would have been those that

23   Dr. Dorchak said should apply to you during the

1        A.    I don't remember the time frame for pain

2    management.  But I remember going to pain

3    management, but I don't remember the dates.

4        Q.    Okay.  Did your pain get worse when you

5    came back to work in February of '05?

6        A.    I don't remember.

7        Q.    Now, when you came back to work in

8    February of '05, what did you do for Army Fleet

9    Support?

10        A.    I want to say the parts turn-in.

11        Q.    And was it with the Apaches?

12        A.    Yes.

13        Q.    Were you working -- the only person

14    doing parts turn-in on your shift?

15        A.    Now, that I don't remember.

16        Q.    Were you working first shift?

17        A.    Yes.

18        Q.    That's daytime?

19        A.    Yes.

20        Q.    And do you remember the shift hours?

21        A.    6 to 2:30.

22        Q.    Now, I may have asked you this already

23    but refresh me.  After you went out in July of '05,

1    Exhibit 8.  This is a return to work slip dated

2    January 11 of 2006 in which it is stated that

3    Lowell Green said that the company can accommodate

4    your medical restrictions at that point.  Do you

5    recall that happening?

6        A.    Yes.

7        Q.    This would have been two and a half

8    weeks or so after he had said that the company

9    could not accommodate your restrictions.  Let me

10   ask you -- the first decision was made December the

11   22nd of 2005.  Is that kind of a low period for

12   aviation training at Fort Rucker?  Are the schools

13   down?

14       A.    Yes.

15       Q.    And the airmen or soldiers get a chance

16   to go home and take leave if they want to?

17       A.    I would imagine.

18       Q.    And do you know what happened, if

19   anything, to cause Mr. Green to say that he could

20   accommodate your restrictions on January the 11th

21   of 2006?

22       A.    No.

23       Q.    Do you recall ever meeting with him

1    return to work slip say no lifting over 20 pounds,

2    no repetitive bending for three months.

3        A.    Uh-huh.

4        Q.    It doesn't say anything about climbing.

5        A.    So, evidently, I must have been able --

6    it would have been okay to climb at that point

7    those two steps I just referred to.

8        Q.    Okay.  Let me come back to the issue of

9    bending.  Do you think you could have worked as an

10   aircraft mechanic without repetitively bending?

11       A.    Yes.

12       Q.    Did you request to be an aircraft

13   mechanic working on helicopters?

14       A.    When?

15       Q.    At that time, January of '06.

16       A.    No.

17       Q.    Was there any discussion of your

18   returning to work on the helicopters?

19       A.    No.

20       Q.    Do you know why they did not send you to

21   work on the helicopters?

22       A.    No, I don't.

23       Q.    Was there any discussion of why you were

1    being sent to work in parts turn-in?

2         A.    Well, I had had previous experience with

3    the aircraft parts turn-in area, and I did a good

4    job.  And they returned me back to that area for

5    that reason.

6         Q.    But was there any discussion of this?

7         A.    Of --

8         Q.    Of why they were sending you to parts

9    turn-in?

10         A.    Because of my restrictions.

11         Q.    I mean, did somebody talk to you about

12    it, or is this just your --

13         A.    No.  Lowell Green talked to me about it,

14    about he was going to put me back in parts turn-in.

15         Q.    All right.  What do you recall of that

16    discussion?

17         A.    That C. T. Dean was with me, which is a

18    union rep, and we sat down and talked to Lowell

19    Green.  And he was going to put me back in the

20    parts turn-in area with Byron Register, and we were

21    going to work together and that he was going to be

22    the lead in that area.

23         Q.    Byron Register --

1     A.     Yes.

2     Q.     -- was?

3     A.     Yes.

4     Q.     What else do you recall of that

5  discussion?

6     A.     That's all I can remember.

7     Q.     Did that discussion occur on or about

8  January the 11th of 2006?

9     A.     Yes.

10    Q.     In Mr. Green's office?

11    A.     Yes.

12    Q.     Was anybody else present other than you

13 and Mr. Dean and Mr. Green?

14    A.     That's all.

15    Q.     How long did that conversation last?

16    A.     I'm really not sure of how long.  I want

17 to say 30 minutes maybe.

18    Q.     Did y'all discuss your restrictions?

19    A.     Yes.

20    Q.     What do you recall of that discussion?

21    A.     Well, he knew I wasn't able to lift more

22 than 20 pounds and that would be a good area for me

23 and there wasn't any excessive bending.

1      Q.      Well, at the end of March, AFS was short

2  on aircraft mechanics working on the helicopters,

3  wasn't it?

4      A.      I don't remember if they were or not.

5      Q.      Well, didn't you get an instruction in

6  early April that you needed to -- you were going to

7  have to get your tools and go back and work on

8  helicopters there, the OH-58s?

9      A.      What year?

10     Q.      '06, 2006.

11     A.      Yes.

12     Q.      And that came from Bruce Swarthout?

13     A.      This came from Tony Wasco, that I was

14  going to have to go back as an aircraft mechanic.

15     Q.      All right.  What do you recall of that

16  conversation?  Number one, where did it take place?

17     A.      It took place on Hanchey Field in the 58

18  hangar.

19     Q.      Was it in an office area or just out in

20  the hangar?

21     A.      In an office area.

22     Q.      And is that where Mr. Wasco has his

23  office?

1      A.     Yes.

2      Q.     And what do you recall him saying to

3  you?

4      A.     That he told me I was going back on the

5  helicopter tomorrow and I would not be doing parts

6  turn-in, that Byron Register would be doing parts

7  turn-in.

8      Q.     And what was your response to that?

9      A.     I told him I had restrictions.

10     Q.     Well, but you could work as a helicopter

11  mechanic with those restrictions, couldn't you?

12     A.     If I was assisted or accommodated with

13  those restrictions, yes.

14     Q.     What else was said?

15     A.     I told him I had restrictions and that

16  Byron Register would be doing parts turn-in.  He

17  said he wasn't aware of my restrictions.  So I had

18  to go back to my personal bag that was in the

19  hangar, and I took out my restrictions.  And I took

20  them back to Tony Wasco, and I showed him my

21  restrictions.

22     Q.     And what did he say?

23     A.     Again, he said he wasn't aware of those

1    AFS made for him?

2        A.    No, I don't.

3        Q.    Do you know of anybody else that had

4    limitations comparable to yours, the ones that you

5    had in mid-June of '06, that AFS has been able to

6    accommodate for work?

7        A.    No.  Not at this -- no.

8        Q.    Now, one of your claims relates to

9    unemployment compensation.  Can you explain to me

10   what that claim is about?

11       A.    If you've worked at a job and you're

12   laid off, you can claim unemployment benefits.

13       Q.    Okay.  Did you do that in this case?

14       A.    I didn't actually go down to the

15   unemployment office.  No.

16       Q.    Did you call them?

17       A.    No.  I was told by personnel -- or HR

18   that I could not draw unemployment.

19       Q.    Who told you that?

20       A.    Penny Westrick.

21             Excuse me.  If we're not going to be --

22       Q.    Do you need to take a break?

23       A.    If we're not going to be leaving anytime

# PLAINTIFF'S

# EXHIBIT J

**DeFrank v. Army Fleet Support, L.L.C.; Case No. 1:07-cv-775-WKW**

## SOUTHERN BONE & JOINT SPECIALISTS, P.C.

To:   Whom it may concern                                    Date:

Name: *Paula De Frank*                                       4/21/00

This is to certify that this patient

(X)   Was treated in my office today.

( )   Will be unable to work for the period_____

( )   May return to work on _____

( )   Should not participate in physical education for the period _____

(X)   Other:
      *Light duty × 3 weeks*

                                    *Dr. Granger Smith, RN*

                                                                    3/95

NAME: PAULA      F  DEFRANK
BADGE NUMBER: 014311                    SUPERVISOR: KORDA, III     W
SSN: 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          SENIORITY: 01/03/00          SECURITY: N
SKILL: 01A  AIRCRAFT MECHANIC
BONUS:   ALIC: A  PLIC: X
DEPARTMENT: 11  AIRCRAFT MAINTENANCE-DIRECT
LOCATION: 11  HANCHEY FIELD          SHIFT: 1
PAYROLL DATE: 04/24/00   EFFECTIVE DATE: 04/24/00

REASON FOR ACTION:1   RESTRICTED DUTY - NO HEAVY LIFTING OR PULLING FOR 3
                WEEKS                    MCF

RESTRICTED DUTY   : R

                              APPROVED BY: DAVID HELTON

                       COMPANY CONFIDENTIAL
                         DYNCORP 01-212

```
NAME: PAULA        F  DEFRANK
BADGE NUMBER: 014311              SUPERVISOR: TURNEY        LW
SSN: 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           SENIORITY: 01/03/00        SECURITY:
SKILL: 01A  AIRCRAFT MECHANIC
BONUS:  ALIC: A  PLIC: P
DEPARTMENT: 11  AIRCRAFT MAINTENANCE-DIRECT
LOCATION: 11  HANCHEY FIELD           SHIFT: 2
PAYROLL DATE: 10/30/00    EFFECTIVE DATE: 11/03/00
```

```
REASON FOR ACTION:1   RESTRICTED DUTY - NO LIFTING, PUSHING PUULLING OR CARRYI
                 NG 10-25 LBS. 3 WEEKS
```

```
RESTRICTED DUTY   : R
```

```
                              APPROVED BY: DAVID HELTON
```

```
                      COMPANY CONFIDENTIAL
                      DYNCORP 01-212
```

```
PERSONAL ACCIDENT INSURANCE STATUS: B  BENEFIT AMT: 200,000.00
```

Excuse/Note for: ☐ School  ☐ Employer   ☐ Assisting Patient (Name_____)  ☐ Letter to Coach  ☐ Homebound teacher____ wks
Note:

| **WC INJURY REPORT** **Treatment Today** | ☐ Initial evaluation ☐ F/U evaluation ☐ Postop evaluation ☐ Fracture care ☐ Wound care ☐ Suture removal ☐ Record review NOTES: | ☐ Care coordination ☐ Injection ☐ Steroid ☐ Hyaluronic acid ☐ Regional block ☐ Procedure_____ ☐ Other_____ | ☐ Therapy ☐ Functional exercise ☐ Modalities ☐ Manipulation ☐ Therapool ☐ Dx code # _____ ☐ Dx description_____ |

**Treatment Ordered**
☐ Orthotic  ☐ Physical therapy  IP/OP  1X week 2X week 3X week 4X week qd____ weeks
☐ Regional blocks  ☐ Occupational therapy  IP/OP  1X week 2X week 3X week 4X week qd____ weeks
☐ Epidural steroids  ☐ Surgery recommended
☐ Pain management  ☐ FCE  ☐ Other:_____
☐ Impairment rating  ☐ Work reconditioning

**Tests Ordered**
☐ Arthrogram  ☐ Electrodiagnostic studies  ☐ Blood flow  ☐ Lab
☐ CT with contrast  ☐ CT no contrast  ☐ Myelogram/CT  ☐ Nuclear scan
☐ MRI with contrast  ☐ MRI no contrast  ☐ Discogram  ☐ Other:_____

**Medications**
| Drug | Amount | Signature | Refill |

**Work Status**  ☐ Out of work until____/next appointment  ☐ Return to work no restrictions____  ☑ Return to work with restrictions____

**Intensity**
☑ Sedentary  no lifting/push-pull/carrying  ☐ Medium  lift/push-pull/carry  25-50 lbs
☐ Sedentary  lift/push-pull/carry  0-10 lbs  ☐ Heavy  lift/push-pull/carry  50-100 lbs
☐ Light  lift/push-pull/carry  10-25 lbs  ☐ Per functional capabilities evaluation

**RESTRICTIONS**  ☐ Initial ☐ Same ☐ Update (only changes noted)   Return to work as:_____
**Task**
(Tasks not marked are not applicable to problem being treated)

| Task | Without restrictions | R | L | B | Never | Occas | Freq | Hours (cont) | Hours (max) | Notes / Job Title |
|---|---|---|---|---|---|---|---|---|---|---|
| Use upper extremity | ☐ | ☐ | ☐ | ☐ | ☐ | ☑ | ☐ | | | |
| Upper extremity repetitive tasks | ☐ | ☐ | ☐ | ☐ | ☐ | ☑ | ☐ | | | |
| Push/pull (at intensity above) | ☐ | ☐ | ☐ | ☐ | ☐ | ☑ | ☐ | | | |
| Lift (at intensity above) | ☐ | ☐ | ☐ | ☐ | ☐ | ☑ | ☐ | | | |
| Reach | ☐ | ☐ | ☐ | ☐ | ☑ | ☐ | ☐ | | | |
| Upper extremity at waist level | ☐ | ☐ | ☐ | ☐ | ☐ | ☑ | ☐ | | | |
| Upper extremity at shoulder level | ☐ | ☐ | ☐ | ☐ | ☐ | ☑ | ☐ | | | |
| Upper extremity at overhead level | ☐ | ☐ | ☐ | ☐ | ☑ | ☐ | ☐ | | | |
| Wrist repetitive tasks | ☐ | ☐ | ☐ | ☐ | ☐ | ☑ | ☐ | | | |
| Use hand | ☐ | ☐ | ☐ | ☐ | ☐ | ☑ | ☐ | | | |
| Grasping | ☐ | ☐ | ☐ | ☐ | ☐ | ☑ | ☐ | | | |
| Fine manipulation | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | | | |
| Sit | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | | | |
| Weight bearing lower extremity | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | | | |
| Standing | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | | | |
| Walking | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | | | |
| Bend at waist | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | | | |
| Squat | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | | | |
| Kneel | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | | | |
| Crawl | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | | | |
| Climb (ladder/stair) | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | | | |
| Operate foot controls | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | | | |
| Drive | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | | | |

01/26/01   10:00   DR: 10  LOC: 1
497498.0  PAULA F. DEFRANK
DOB:03/22/55  SSN: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
Shoulder RC Right

**Environmental concerns**  ☐ Unprotected heights  ☐ Moving machinery  ☐ Dust fumes  ☐ Extreme temperatures (hot/cold)  ☐ Unlevel surface

**Recommendations**
☐ Keep area clean & dry  ☐ Frequent breaks  ☐ Frequently alternate sit/stand/walk  ☐ Other:_____
☐ Use cane  ☐ Use crutch  ☐ Wear splint/brace on duty
☐ Modify work station  ☐ Job rotation  ☐ Max shift length (hours)
☐ Non-production tasks  ☐ 2  ☐ 4  ☐ 6  ☐ 8

**Prognosis**  ☐ MMI____  ☐ Pending (Est. ☐ Weeks____ ☐ Months____)  ☐ PPI ____% part  ____%WP  Vocational Rehab: ☐ Unlikely  ☐ Probably  ☐ Necessary

**Recheck** ☐ Office  ☐ Phone  ☐ Progress call  ☐ Patient to call  ☐ PRN  ☐ Surgery
☐ Days____ ☐ Weeks____ ☐ Months____ ☐ After test____
Next Appointment (date):_____
Referral to Dr. McClusky for partial shoulder endoscopy Neck/arm/elbow
Signature: _____

Excuse/Note for: ☐ School ☐ Employer ☐ Assisting Patient (Name_____) ☐ Letter to Coach ☐ Homebound teacher_____wks
Note:

| **WC INJURY REPORT**<br><br>Treatment Today | ☐ Initial evaluation<br>☐ F/U evaluation<br>☐ Postop evaluation<br>☐ Fracture care<br>☐ Wound care<br>☐ Suture removal<br>☐ Record review<br>NOTES: | ☐ Care coordination<br>☐ Injection<br>  ☐ Steroid<br>  ☐ Hyaluronic acid<br>  ☐ Regional block<br>☐ Procedure_____<br>☐ Other_____ | ☐ Therapy<br>☐ Functional exercise<br>☐ Modalities<br>☐ Manipulation<br>☐ Therapool<br>☐ Dx code #_____<br>☐ Dx description_____ |
|---|---|---|---|

| Treatment Ordered | ☐ Orthotic<br>☐ Regional blocks<br>☐ Epidural steroids<br>☐ Pain management<br>☐ Impairment rating | ☐ Physical therapy  IP/OP  1X week 2X week 3X week 4X week qd____weeks<br>☐ Occupational therapy  IP/OP  1X week 2X week 3X week 4X week qd____weeks<br>☐ Surgery recommended<br>☐ FCE    ☐ Other:_____<br>☐ Work reconditioning  _____ |
|---|---|

| Tests Ordered | ☐ Arthrogram<br>☐ CT with contrast<br>☐ MRI with contrast | ☐ Electrodiagnostic studies<br>☐ CT no contrast<br>☐ MRI no contrast | ☐ Blood flow<br>☐ Myelogram/CT<br>☐ Discogram | ☐ Lab<br>☐ Nuclear scan<br>☐ Other:_____ |
|---|---|---|---|---|

| Medications | Drug | Amount | Signature | Refill |
|---|---|---|---|---|
| | _____ | _____ | _____ | _____ |
| | _____ | _____ | _____ | _____ |

| Work Status | ☐ Out of work until____/next appointment ☐ Return to work no restrictions____ ☒ Return to work with restrictions____ |
|---|---|

| Intensity | ☐ Sedentary  no lifting/push-pull/carrying<br>☐ Sedentary  lift/push-pull/carry  0 -10 lbs<br>☐ Light  lift/push-pull/carry 10 -25 lbs | ☐ Medium  lift/push-pull/carry  25 -50 lbs<br>☐ Heavy  lift/push-pull/carry  50 -100 lbs<br>☐ Per functional capabilities evaluation |
|---|---|

**RESTRICTIONS** ☐ Initial ☐ Same ☐ Update (only changes noted)   Return to work as:_____

| Task<br>*(Tasks not marked are not applicable to problem being treated)* | Without restrictions | R | L | B | Never | Occas | Freq | Hours (cont) | Hours (max) | Job Title<br>Notes |
|---|---|---|---|---|---|---|---|---|---|---|
| Use upper extremity | ☐ | ☐ | ☐ | ☐ | ☑ | ☐ | ☐ | | | |
| Upper extremity repetitive tasks | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | | | |
| Push/pull (at intensity above) | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | | | |
| Lift (at intensity above) | ☐ | ☐ | ☐ | ☐ | ☑ | ☐ | ☐ | | | |
| Reach | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | | | |
| Upper extremity at waist level | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | | | |
| Upper extremity at shoulder level | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | | | |
| Upper extremity at overhead level | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | | | Rt shoulder only |
| Wrist repetitive tasks | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | | | |
| Use hand | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | | | |
| Grasping | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | | | |
| Fine manipulation | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | | | |
| Sit | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | | | |
| Weight bearing lower extremity | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | | | |
| Standing | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | | | |
| Walking | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | | | |
| Bend at waist | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | | | |
| Squat | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | | | |
| Kneel | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | | | |
| Crawl | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | | | |
| Climb (ladder/stair) | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | | | |
| Operate foot controls | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | | | |
| Drive | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | | | |

03/23/01 11.00 DR: 10 LOC: 1 / 497498.0 DOB:03/22/55 SSN: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 / Shoulder RC Right / PAULA F. DEFRANK

| Environmental concerns | ☐ Unprotected heights ☐ Moving machinery ☐ Dust fumes ☐ Extreme temperatures (hot/cold) ☐ Unlevel surface |
|---|---|

| Recommendations | ☐ Keep area clean & dry  ☐ Frequent breaks ☐ Frequently alternate sit/stand/walk  ☐ Other:_____<br>☐ Use cane  ☐ Use crutch  ☐ Wear splint/brace on duty<br>☐ Modify work station  ☐ Job rotation  ☐ Max shift length (hours)<br>☐ Non-production tasks     ☐ 2  ☐ 4  ☐ 6  ☐ 8 |
|---|---|

| Prognosis | ☐ MMI_____ ☐/Pending (Est: ☐ Weeks____ ☐ Months____) | ☐ PPI ____% part ____%WP<br>Vocational Rehab: ☐ Unlikely ☐ Probably ☐ Necessary |
|---|---|---|

| Recheck ☐ Office<br>  ☐ Phone<br>    ☐ Progress call<br>    ☐ Patient to call<br>  ☐ PRN<br>  ☐ Surgery | ☐ Days____ ☐ Weeks____ ☐ Months____ ☑ After test____<br>Next Appointment (date):_____<br><br>☐ IR to:_____ | Signature:_____ |
|---|---|---|

**RETURN TO WORK SLIP**

DATE: 6-15-01     TIME: 9:31     FROM: Human Resources

| EMPLOYEE NAME | NUMBER | CLASSIFICATION | LOCATION |
|---|---|---|---|
| Paula De Frank | 4311 | Afc Mech | H-1 |

☐ Authorized to return to work with **NO RESTRICTIONS** on _____

☐ Presently working and released from **RESTRICTED/LIGHT DUTY** on _____

☒ Authorized to return to work on ___6-18-01___ with the following **RESTRICTION/LIGHT DUTY**: _Sedentary – no lifting / push-pull / carrying_

☐ **Company Cannot Accommodate Medical Restriction(s).** Date _____

☐ Comments _____

☐ **Prescribed Medications** _Only at night_

An employee returning with restrictions or assigned to light duty will not be entitled to work overtime in accordance with Article 11.1 of the Collective Bargaining Agreement, until Personnel receives a statement from the doctor stating the employee may return to normal duties.

Employees on Restricted Duty should be by-passed when scheduling or polling for overtime. If asked, the employee must refuse the overtime. In either case, whether by-passed, or asked and refused, the employee is not charged.

Original:   Personnel File
Copies:     Finance & Accounting
            Department Head
            Employee

Form 01-288
Rev. 09-02-97

# RETURN TO WORK SLIP

**DATE:** 08-23-01          **TIME:** 2:15 Pm          **FROM:** Human Resources

| EMPLOYEE NAME | NUMBER | CLASSIFICATION | LOCATION |
|---|---|---|---|
| DeFrank, Paula | 014311 | AC Mechanic | Hanchey |

☐ Authorized to return to work with **NO RESTRICTIONS** on _____

☐ Presently working and released from **RESTRICTED/LIGHT DUTY** on _____

☒ Authorized to return to work on 08-23-01 _____ with the following **RESTRICTION/
LIGHT DUTY:** May lift, push, pull, carry 0-10#
OK per George @ Hanchey

☐ **Company Cannot Accommodate Medical Restriction(s).** Date _____

Comments _____

☒ **Prescribed Medications** Elavil (Take only at night)

An employee returning with restrictions or assigned to light duty will not be entitled to work overtime in accordance with Article 11.1 of the Collective Bargaining Agreement, until Personnel receives a statement from the doctor stating the employee may return to normal duties.

Employees on Restricted Duty should be by-passed when scheduling or polling for overtime. If asked, the employee must refuse the overtime. In either case, whether by-passed, or asked and refused, the employee is not charged.

Original:     Personnel File
Copies:       Finance & Accounting
              Department Head
              Employee

Form 01-288
Rev. 09-02-97

**RETURN TO WORK SLIP**

**DATE:** 12-06-01     **TIME:** 2:03 pm     **FROM:** Human Resources

| EMPLOYEE NAME | NUMBER | CLASSIFICATION | LOCATION |
|---|---|---|---|
| DeFrank, Paula | 014311 | A/c mech | Hanchey-1 |

☐ Authorized to return to work with **NO RESTRICTIONS** on _____

☐ Presently working and released from **RESTRICTED/LIGHT DUTY** on _____

☒ Authorized to return to work on ___12-07-01___ with the following **RESTRICTION/ LIGHT DUTY:** no lifting/pushing/pulling/carrying _____

_____

☐ **Company Cannot Accommodate Medical Restriction(s).** Date _____

Comments _____

☒ **Prescribed Medications** None

An employee returning with restrictions or assigned to light duty will not be entitled to work overtime in accordance with Article 11.1 of the Collective Bargaining Agreement, until Personnel receives a statement from the doctor stating the employee may return to normal duties.

Employees on Restricted Duty should be by-passed when scheduling or polling for overtime. If asked, the employee must refuse the overtime. In either case, whether by-passed, or asked and refused, the employee is not charged.

Original: Personnel File                Form 01-288
Copies:   Finance & Accounting           Rev. 09-02-97
        Department Head
        Employee

RETURN TO WORK SLIP

PB9 1/18

| DATE: 01-10-02 | TIME: 1:18 Pm | FROM: Human Resources |
|---|---|---|

| EMPLOYEE NAME | NUMBER | CLASSIFICATION | LOCATION |
|---|---|---|---|
| Defrank, Paula | 014311 | A/c mech. | H-1 |

☐ Authorized to return to work with **NO RESTRICTIONS** on _____

☐ Presently working and released from **RESTRICTED/LIGHT DUTY** on _____

☑ Authorized to return to work on ___01-11-02___ with the following **RESTRICTION/ LIGHT DUTY**: Lift/carry/push/pull 10-25#

_____

☐ **Company Cannot Accommodate Medical Restriction(s).** Date _____

Comments _____

☑ **Prescribed Medications** ___NONE___

An employee returning with restrictions or assigned to light duty will not be entitled to work overtime in accordance with Article 11.1 of the Collective Bargaining Agreement, until Personnel receives a statement from the doctor stating the employee may return to normal duties.

Employees on Restricted Duty should be by-passed when scheduling or polling for overtime. If asked, the employee must refuse the overtime. In either case, whether by-passed, or asked and refused, the employee is not charged.

| Original: | Personnel File | Form 01-288 |
|---|---|---|
| Copies: | Finance & Accounting | Rev. 09-02-97 |
| | Department Head | |
| | Employee | |

 

**David C. Rehak, MD**
Surgery of the Hand/Upper Extremity
Visit Status Report

Main Office - Hughston Clinic
6262 Veterans Parkway
COLUMBUS, GA 31908
DAVID C. REHAK, MD 04/30/2003
PAULA F DEFRANK #497498

Revised: 07/01

## DIAGNOSIS

| Carpal Tunnel | Tennis Elbow | Arthritis | Pain | Finger/Hand | Skin |
| Cubital Tunnel | Ganglion Cyst | Bursitis | Sprain | Wrist/Forearm | Tendon |
| Trigger Finger | Amputation | Synovitis | Contusion | Elbow/Arm | Nerve |
| DeQuervain s | | Tendinitis | Fracture | Shoulder | |
| | | Infection | Laceration | Other:_____ | |

## TREATMENT PLAN

**MEDICATION:**    NSAID    Steroids    Pain Medication    Antibiotic    Other: _____

**STEROID INJECTION**          **THERAPY**          **SPLINT/BRACE**

**SURGERY:**    The patient may return to work_____ days after surgery with no use of the upper extremity.
Work restrictions as below before surgery. Wounds must be covered, clean, dry.

## DIAGNOSTIC TESTS

NCV/EMG          Arthrogram          Bone Scan

MRi          CT Scan          Lab

## WORK RESTRICTIONS
### Tasks not marked are not restricted

RETURN TO WORK.    Today without restrictions          Today with restrictions below

**Lifting (pounds):**    1    2    5    10    15    20    25    35    50

**Repetitive use:**    Occasional    Limit: Pushing/Pulling/Reaching

**Splint/Brace:**    Mandatory    Optional

**Over-head work:**    Occasional    Never

**Suggest Job Rotation:**    **Work station modification**    **Micro-breaks**

**No use of:**    Right Hand/UE    Left Hand/UE

**Keep wounds clean and dry (includes dust, moisture, perspiration)**

**Pelvis/Lower Extremities:** No Restrictions (bending, squatting, walking, sitting, standing)

**May not drive, operate machinery, or work in dangerous environment while taking narcotic pain medication.**

**Functional Capacity Evaluation (FCE)**          **Work Conditioning/Rehabilitation**

**Maximum Medical Improvement (MMI):**    Today_____ weeks _____ months

**Partial Permanent Impairment (PPI):**    _____ % Extremity    _____ % Whole Body

Pending/Date Scheduled:_____

**Return Appointment:**    _____ days _____ weeks _____ months

After test    After surgery    Impairment Rating    Discharged

**All calls and correspondence concerning Workers Compensation Patients should be directed to the:**
Dedicated Workers Compensation Unit
6262 Veterans Parkway - P.O. Box 9517 — Columbus, Georgia 31908-9517
706-324-6661 — Fax: 706-576-3323

**RETURN TO WORK SLIP**

DATE: _6/0c/03_    TIME: _1130_    FROM: Human Resources

| EMPLOYEE NAME | NUMBER | CLASSIFICATION | LOCATION |
|---|---|---|---|
| DeFRANK Paula | C14311 | Alc Mech | Hinckey |

☐ Authorized to return to work with **NO RESTRICTIONS** on _____

☐ Presently working and released from **RESTRICTED/LIGHT DUTY** on _____

☑ Authorized to return to work on _6/23/03_ _____ with the following **RESTRICTION/LIGHT DUTY:** Lift/carry/Push/pull in 25 lbs no lifting overhead
ok per Dr Bob Hixcell

☐ **Company Cannot Accommodate Medical Restriction(s)/Medications.** Date_____

☐ Comments _____

☐ **Prescribed Medications** _____

An employee returning with restrictions or assigned to light duty will not be entitled to work overtime in accordance with Article 11.1 of the Collective Bargaining Agreement, until Personnel receives a statement from the doctor stating the employee may return to normal duties. Employees on Restricted/Light Duty should be by-passed when scheduling or polling for overtime. If asked, the employee must refuse the overtime.

Employees working with restrictions or on light duty will be charged the number of hours available had the employee not been restricted or on light duty.

| Original: | Personnel File | Form 01-288 |
|---|---|---|
| Copies: | Finance & Accounting | Rev. 05-06-02 |
| | Department Head | |
| | Employee | |

# ARMY FLEET SUPPORT

## RETURN TO WORK SLIP

DATE: 6-28-04     TIME: 1:05pm   Last Day Worked: 12-31-03

☒ Short-Term Disability    ☒ FMLA    ☐ OTJ Injury (use only if no Medical Pass)    ☐ Other

| EMPLOYEE NAME | NUMBER | CLASSIFICATION | LOCATION/SHIFT |
|---|---|---|---|
| Paula DeFrank | 014311 | A/c Mech | Hanchey-1 |

☐ Authorized to return to work with **NO RESTRICTIONS** on _____

☐ Presently working and released from **RESTRICTED/LIGHT DUTY** on _____

☒ Authorized to return to work on ___6-29-04___ with the following **RESTRICTION/LIGHT DUTY**: No lift/push/pull >20#, No outstretched reach, No overhead work, No repetitive motion w/arms + neck.

☒ Able to Accommodate Medical Restriction(s)?  ☒ Can  ☐ Cannot

- **Per Field Representative (name/title):** George Anderson, Field Mgr
- Date 6-28-04
- Comments Work until 8-3-04, Surgery 8-5-04 Record # 04-0010

☐ Prescribed Medications  N/A

- **Non Narcotics:** _____
- **Narcotics:** _____

  **\*\*Narcotic Drugs cannot be taken within 6 hours of shift start time nor during shift\*\***

  **Employee Initials:** _____

---

An employee returning with restrictions or assigned to light duty will not be entitled to work overtime in accordance with Article 11.1 of the Collective Bargaining Agreement, until Personnel receives a statement from the doctor stating the employee may return to normal duties.

Employees on Restricted Duty will be by-passed when scheduling or polling for overtime. If asked, the employee must refuse the overtime. In either case, whether by-passed, or asked and refused, the employee is not charged.

**Manager, Personnel Services** ___Addison 12948___

**Benefits / Worker's Comp Representative** ___ 020078 6-28-04___

---

| Original: | Personnel File | Form 01-288 |
|---|---|---|
| Copies: | Finance & Accounting | Rev. 1/30/04 |
| | Department Head | |
| | Employee | |

ield Notified

Date: _____          Method: ☐ Email  ☐ Fax  ☐ Phone       AFS  0163

POC: _____

# ARMY FLEET SUPPORT

## RETURN TO WORK SLIP

DATE: _02-22-05_   TIME: _____   Last Day Worked: _08-10-04_

☑ **Short-Term Disability**   ☐ **FMLA**   ☐ **OTJ Injury** (use _only_ if no Medical Pass)   ☐ **Other**

| EMPLOYEE NAME | NUMBER | CLASSIFICATION | LOCATION/SHIFT |
|---|---|---|---|
| DeFrank, Paula | 014311 | A/C Mech | Hanley-1 |

☐ Authorized to return to work with **NO RESTRICTIONS** on _____

☐ Presently working and released from **RESTRICTED/LIGHT DUTY** on _____

☑ Authorized to return to work on _02-23-05_ with the following **RESTRICTION/LIGHT DUTY:** No lifting over 25 lbs - No climbing - No excessive bending

☐ Able to Accommodate Medical Restriction(s)?   ☑ **Can**   ☐ **Cannot**
- Per Field Representative (name/title): George Anderson
- Date _____
- Comments _Rec # 05-0149_

☐ Prescribed Medications
- **Non Narcotics:** _____
- **Narcotics:** Morphine Sulfate

  **\*\*Narcotic Drugs cannot be taken within 6 hours of shift start time nor during shift\*\***
  **Employee Initials:** _PD_

An employee returning with restrictions or assigned to light duty will not be entitled to work overtime in accordance with Article 11.1 of the Collective Bargaining Agreement, until Personnel receives a statement from the doctor stating the employee may return to normal duties.

Employees on Restricted Duty will be by-passed when scheduling or polling for overtime. If asked, the employee must refuse the overtime. In either case, whether by-passed, or asked and refused, the employee is not charged.

**Manager, Personnel Services** _____ 020314

**Benefits / Worker's Comp Representative** _____

| Original: | Personnel File | Form 01-288 |
|---|---|---|
| Copies: | Finance & Accounting | Rev. 1/30/04 |
| | Department Head | |
| | Employee | |

<u>eld Notified</u>

Date: _____   Method: ☐ Email   ☐ Fax   ☐ Phone

POC: _____

AFS  0123

7051

**Short Term Disability Claim Statement**



**FORTIS**
Solid partners, flexible solutions℠

---

| Part 1—To be completed by the Employer | Policy/participation/account number |
|---|---|

Claimant's name PAULA DEFRANK

Date employed JAN. 3, 2000   Effective date of plan

Has claimant made prior claim for benefits? ☒ Yes  ☐ No  ☐ When? JAN /2005

Date last worked 7/18/2005

Number of hours worked that day _____

Work schedule at time of disability  ✓ days/week  40 hours/day

Occupation, title or position AIRCRAFT MECH

Describe the claimant's job duties. If available attach a formal job description.
PARTS TURN IN - TAG PARTS, LOG PARTS IN & OUT - DETERMINE THE STATUS OF PART

Basic **weekly** earnings as of last day worked
$

Weekly benefit amount
$

Is claimant eligible for Workers' Compensation as a result of this disability?  ☐ Yes  ☒ No  ☐ Currently disputed

Percentage of premium paid by:    Claimant _____ %    Employer _____ %

Are claimant premium contributions made under Section 125 of the Internal Revenue Code (i.e. a Cafeteria Plan paid with pre-tax dollars)?  ☐ Yes  ☐ No

Has claimant returned to work?  ☐ Yes  ☐ No

If "Yes," on what date __ / __ / __
☐ With restrictions  ☐ Full capacity

Remarks

Employer's name

Address

Telephone number
(    )

Fax number
(    )

E-mail address

Your name and title

Date

Signature

---

**Part 2—To be completed by the Claimant** *(Please print or type.)*

Name PAULA DEFRANK

Social Security number 423822970

Date of birth 3/22/55

Street address 148 RADFORD CIRCLE

City DOTHAN

State AL

Zip code 36301

Home phone (334) 794-9311

Sex:  ☐ Male  ☒ Female

Type of disability:  ☒ Accident  ☐ Illness  ☐ Pregnancy

E-mail address

Describe how and where accident occurred or list symptoms of illness and diagnosis.
CARE ACCIDENT - REARENDED BY 4 CARS (BACK & NECK PAIN) Rt. SHOULDER

Are you receiving or eligible to receive Workers' Compensation or Social Security disability benefits? *(Describe.)*  ☐ Yes  ☒ No

Is your accident or illness work related?  ☐ Yes  ☒ No  If "Yes," please explain.

Date symptoms first appeared
JAN. 5, 2004

Date first treated
JAN. 5, 2004

Date first unable to work
JAN. 5, 2004

Physician(s) name and address

---

I authorize any provider of medical services, insurance company, consumer reporting agency, Social Security Administration, governmental agency, educational institution, law enforcement agency or employer having medical information with respect to any physical or mental condition, rehabilitation and other non-medical information of me to give to Fortis Benefits Insurance Company, or its representative, any and all such information. I understand Fortis Benefits Insurance Company may discuss my limitations/restrictions with current or prospective employers as they relate to accommodations and possible return to work. **I UNDERSTAND** the information obtained by use of this Authorization will be used by Fortis Benefits Insurance Company to determine the eligibility for benefits. I know that a photographic copy of this authorization shall be as valid as the original. I agree this Authorization shall be valid for the duration of the claim.

If I receive a disability benefit greater than that which I should have been paid, I understand this insurance company has the right to recover such overpayments from me, including the rights to reduce or adjust future benefits, if any.

Signature

Date __ / __ / __

---

**After completion of Parts 1 and 2, forward to Attending Physician for completion of Part 3.**

KC0384A (3/2001) P



## John D. Dorchak, M.D.

December 22, 2005

RE: Paula Defrank
Chart No: 497498

To: Whom It May Concern

Paula Defrank is a patient of mine at The Hughston Clinic in Columbus, Ga. She underwent an anterior cervical fusion on 8/12/04. She can return to work as of 12/27/05 with no lifting greater than 20 pounds and no repetitive bending. These restrictions are in effect until three months from now.

If you have any further questions, you can contact me at (706) 494-3257.

Sincerely,

John D. Dorchak, M.D.

Columbus Main Clinic
6262 Veterans Parkway ~ P.O. Box 9517 ~ Columbus, Georgia 31908-9517
706/324-6661 ~ WATS: 800/331-2910 ~ http://www.hughston.com

AFS 0115

# ARMY FLEET SUPPORT

## RETURN TO WORK SLIP

DATE: 12-22-05    TIME: 10:30    Last Day Worked: 07-15-05

☒ Short-Term Disability    ☐ FMLA    ☐ OTJ Injury (use only if no Medical Pass)    ☐ Other

| EMPLOYEE NAME | NUMBER | CLASSIFICATION | LOCATION/SHIFT |
|---|---|---|---|
| DeFrank, Paula F. | 014311 | A/C Mech | Hanchey-1 |

☐ Authorized to return to work with **NO RESTRICTIONS** on _____

☐ Presently working and released from **RESTRICTED/LIGHT DUTY** on _____

☒ Authorized to return to work on 12-27-05 _____ with the following **RESTRICTION/ LIGHT DUTY**: No lifting over 20 lbs, No repetitive bending for 3 months

☐ Able to Accommodate Medical Restriction(s)?    ☐ Can    ☒ Cannot
- Per **Field Representative** (name/title): Dowell Green
- Date 12-22-05
- **Comments** _____

☐ Prescribed Medications
- **Non Narcotics:** _____
- **Narcotics:** _____
  **\*\*Narcotic Drugs cannot be taken within 6 hours of shift start tim~   during shift\*\***
  **Employee Initials:** _____

An employee returning with restrictions or assigned to ligh~ the Collective Bargaining Agreement, until Personnel recei~ duties.

Employees on Restricted Duty will be by-passed when sche~ overtime. In either case, whether by-passed, or asked and ~

**Manager, Personnel Services** _____

**Benefits / Worker's Comp Representative** _____

Scheduled to return to work on 01-09-06 Per JoAnne G.

~ce with Article 11.1 of ~nay return to normal

~nust refuse the

| Original: | Personnel File |
|---|---|
| Copies: | Finance & Accounting |
| | Department Head |
| | Employee |

Form 01-288
Rev. 1/30/04

~ield Notified

Date: _____    Method: ☐ Email    ☐ Fax    ☐ Phone    AFS 0114

POC: _____

# ARMY FLEET SUPPORT

## RETURN TO WORK SLIP

DATE: 01-11-05    TIME: 12:41    Last Day Worked: 07-15-05

☐ **Short-Term Disability**    ☐ **FMLA**    ☐ **OTJ Injury** (use only if no Medical Pass)    ☐ **Other**

| EMPLOYEE NAME | NUMBER | CLASSIFICATION | LOCATION/SHIFT |
|---|---|---|---|
| DeFrank, Paula | 014311 | A/c Mech | Hanchey-1 |

☐ Authorized to return to work with **NO RESTRICTIONS** on _____

☐ Presently working and released from **RESTRICTED/LIGHT DUTY** on _____

☒ Authorized to return to work on _12-27-05_ with the following **RESTRICTION/ LIGHT DUTY:** No lifting over 20 lbs - No repetitive bending for 3 months

☒ Able to Accommodate Medical Restriction(s)?  ☒ **Can**  ☐ **Cannot**    Record # 06-0350
- **Per Field Representative** (name/title): Dowell Green
- Date 01-11-06
- Comments Mr. Green had previously denied accommodation

☐ Prescribed Medications for restrictions on 12-22-05
- **Non Narcotics:** _____
- **Narcotics:** _____

   ***Narcotic Drugs cannot be taken within 6 hours of shift start time nor during shift***

   **Employee Initials:** _____

An employee returning with restrictions or assigned to light duty will not be entitled to work overtime in accordance with Article 11.1 of the Collective Bargaining Agreement, until Personnel receives a statement from the doctor stating the employee may return to normal duties.

Employees on Restricted Duty will be by-passed when scheduling or polling for overtime. If asked, the employee must refuse the overtime. In either case, whether by-passed, or asked and refused, the employee is not charged.

**Manager, Personnel Services** _____

**Benefits / Worker's Comp Representative** Penny Westrick 015702

| Original: | Personnel File | Form 01-288 |
|---|---|---|
| Copies: | Finance & Accounting | Rev. 1/30/04 |
| | Department Head | |
| | Employee | |

**Field Notified**    AFS  0113

Date: _____    Method: ☐ Email  ☐ Fax  ☐ Phone

POC: _____

**John D. Dorchak, M.D.**
BD 0146818 GA
GA License 039090

Je   Mercedat, PA-C
GA License 004283
DEA # MM1116246

**The Hughston Clinic, P.C.**
6262 Veterans Parkway ~ P.O. Box 9517 ~ Columbus, GA 31908
706/324-6661 ~ Fax: 706/494-3103

NAME _Paul c. DeFrank_____ AGE _____

ADDRESS _____

DATE ___3/3/06_____

**R**         restrictions Remain
the same with no
Lifting above 25 lbs.
No excessive Bending
for the next 3 mths.

Refill _____ times
☐ Label
This Prescription Authorized Through _____

by _____
                       Signature

DEA # _____

To insure brand name dispensing, prescriber must write "Brand Necessary" on the prescription.
OS1393865

AFS  0088

7572

# ARMY FLEET SUPPORT

## RETURN TO WORK SLIP

DATE: 3-27-06        TIME: 6:00        Last Day Worked: _____

☐ **Short-Term Disability**    ☐ **FMLA**    ☐ **OTJ Injury** (use only if no Medical Pass)    ☐ **Othe**

| EMPLOYEE NAME | NUMBER | CLASSIFICATION | LOCATION/SHIFT |
|---|---|---|---|
| DeFrank, Paula | 014311 | A/c Mech. | H - 1st |

☐ Authorized to return to work with **NO RESTRICTIONS** on _____

☐ Presently working and released from **RESTRICTED/LIGHT DUTY** on _____

☐ Authorized to return to work on _3-3-06_ with the following **RESTRICTION/LIGHT DUTY:** No lifting over 25 lbs - No excessive bending for 3 Months

☑ Able to Accommodate Medical Restriction(s)?    ☑ **Can**    ☐ **Cannot**.
- **Per Field Representative** (name/title): Ron Farrington
- **Date** 3-27-06
- **Comments** _____

☐ Prescribed Medications
- **Non Narcotics:** _____
- **Narcotics:** Methadose) backlofen

    **\*\*Narcotic Drugs cannot be taken within 6 hours of shift start time nor during shift\*\***
    **Employee Initials:** PD

---

An employee returning with restrictions or assigned to light duty will not be entitled to work overtime in accordance with Article 11.1 of the Collective Bargaining Agreement, until Personnel receives a statement from the doctor stating the employee may return to normal duties.

Employees on Restricted Duty will be by-passed when scheduling or polling for overtime. If asked, the employee must refuse the overtime. In either case, whether by-passed, or asked and refused, the employee is not charged.

**Manager, Personnel Services** _Liz Reese_ , 020541

**Benefits / Worker's Comp Representative** _____

---

Original:  Personnel File
Copies:    Finance & Accounting
           Department Head
           Employee

Form 01-288
Rev. 1/30/04

**Field Notified**

  Date: _____        Method: ☐ Email   ☐ Fax   ☐ Phone

  POC: _____

AFS  0087

J. D. Dorchak, M.D.          Jerry Mer~   PA-C
4018 G                        DEA # MMI116246
GA License 039090.

The Hughston Clinic, P.C.
6262 Veterans Parkway ~ P.O. Box 9517 ~ Columbus, GA 31908
706/324-6661 ~ Fax: 706/494-3103

NAME _Paula DeFrank_____ AGE___

ADDRESS _____

DATE _6|14|06_____

℞          She Can Return to work

           as of 6/19/06

           with no lifting above 20 lbs.

           no excessive bending

Refill ____ times
☐ Label
This Prescription Authorized Through _____
by _____
                        Signature_____
DEA # _____

To insure brand name dispensing, prescriber must write "Brand Necessary" on the prescription.
OS1393865

AFS 0077

**John D. Dorchak, M.D.**
RD M06818 GA
, License 039090

**Jerry Mermedat, PA-C**
GA 06P 02183
DEA # MM1116246

**The Hughston Clinic, P.C.**
6262 Veterans Parkway ~ P.O. Box 9517 ~ Columbus, GA 31908
706/324-6661 ~ Fax: 706/494-3103

NAME _Paula DeFrank_____ AGE _____

ADDRESS _____

DATE __6 | 14 | 06_____

**℞**

She Can Return to Work
as of 6/19/06

with no Lifting above 20 lbs.

No excessive Bending for
3 months.

Refill _____ times
☐ Label
This Prescription Authorized Through _____

by _____  Signature _____

DEA # _____

To insure brand name dispensing, prescriber must write "Brand Necessary" on the prescription.

AFS 0075

# PLAINTIFF'S

# EXHIBIT K

**DeFrank v. Army Fleet Support, L.L.C.; Case No. 1:07-cv-775-WKW**

# ARMY FLEET SUPPORT

## RETURN TO WORK SLIP

DATE: 12-22-05        TIME: 10:30    Last Day Worked: 07-15-05

[X] Short-Term Disability    [ ] FMLA    [ ] OTJ Injury (use only if no Medical Pass)    [ ] Other

| EMPLOYEE NAME | NUMBER | CLASSIFICATION | LOCATION/SHIFT |
|---|---|---|---|
| DeFrank, Paula F. | 014311 | A/C Mech | Hanchey -1 |

[ ] Authorized to return to work with **NO RESTRICTIONS** on _____

[ ] Presently working and released from **RESTRICTED/LIGHT DUTY** on _____

[X] Authorized to return to work on 12-27-05 _____ with the following **RESTRICTION/ LIGHT DUTY**: No lifting over 20 lbs, No repetitive bending for 3 months

[ ] Able to Accommodate Medical Restriction(s)?    [ ] Can    [X] Cannot
- Per Field Representative (name/title): Lowell Green
- Date 12-22-05
- **Comments** _____

[ ] Prescribed Medications
- **Non Narcotics:** _____
- **Narcotics:** _____
   **\*\*Narcotic Drugs cannot be taken within 6 hours of shift start tim~ ~ during shift\*\***
   **Employee Initials:** _____

An employee returning with restrictions or assigned to ligh~ the Collective Bargaining Agreement, until Personnel recei~ duties.

Employees on Restricted Duty will be by-passed when sche~ overtime. In either case, whether by-passed, or asked and ~

**Manager, Personnel Services** _____

**Benefits / Worker's Comp Representative** _____

~ce with Article 11.1 of ~nay return to normal

~must refuse the

*Scheduled to return to work on 01-09-06 Per JoAnne G.*

| Original: | Personnel File |
| Copies: | Finance & Accounting |
| | Department Head |
| | Employee |

Form 01-288
Rev. 1/30/04

Field Notified ,

Date: _____    Method: [ ] Email    [ ] Fax    [ ] Phone        AFS  0114

POC: _____

# PLAINTIFF'S

# EXHIBIT L

**DeFrank v. Army Fleet Support, L.L.C.; Case No. 1:07-cv-775-WKW**

# ARMY FLEET SUPPORT

## RETURN TO WORK SLIP

DATE: 01-11-05    TIME: 12:41    Last Day Worked: 07-15-05

☐ Short-Term Disability    ☐ FMLA    ☐ OTJ Injury (use only if no Medical Pass)    ☐ Other

| EMPLOYEE NAME | NUMBER | CLASSIFICATION | LOCATION/SHIFT |
|---|---|---|---|
| DeFrank, Paula | 014311 | A/c Mech | Hanchey - 1 |

☐ Authorized to return to work with **NO RESTRICTIONS** on ——————————

☐ Presently working and released from **RESTRICTED/LIGHT DUTY** on ——————

☒ Authorized to return to work on  12-27-05  with the following **RESTRICTION/LIGHT DUTY:** No lifting over 20 lbs - No repetitive bending for 3 months

☒ Able to Accommodate Medical Restriction(s)?  ☒ Can  ☐ Cannot    Record # 06-0350

- **Per Field Representative** (name/title): Dowell Green
- **Date** 01-11-06
- **Comments** Mr. Green had previously denied accommodation

☐ Prescribed Medications  for restrictions on 12-22-05

- **Non Narcotics:** _____
- **Narcotics:** _____

   **\*\*Narcotic Drugs cannot be taken within 6 hours of shift start time nor during shift\*\***

   **Employee Initials:** _____

An employee returning with restrictions or assigned to light duty will not be entitled to work overtime in accordance with Article 11.1 of the Collective Bargaining Agreement, until Personnel receives a statement from the doctor stating the employee may return to normal duties.

Employees on Restricted Duty will be by-passed when scheduling or polling for overtime. If asked, the employee must refuse the overtime. In either case, whether by-passed, or asked and refused, the employee is not charged.

**Manager, Personnel Services** _____

**Benefits / Worker's Comp Representative** Penny Westrick  015702

| Original: | Personnel File | Form 01-288 |
|---|---|---|
| Copies: | Finance & Accounting | Rev. 1/30/04 |
| | Department Head | |
| | Employee | |

AFS  0113

**Field Notified**

Date: _____    Method: ☐ Email  ☐ Fax  ☐ Phone

POC: _____

# PLAINTIFF'S

# EXHIBIT M

DeFrank v. Army Fleet Support, L.L.C.; Case No. 1:07-cv-775-WKW

J. D. Dorchak, M.D.          Jerry Merr    PA-C
GA License 039090.                        DEA # MM1116246

**The Hughston Clinic, P.C.**
6262 Veterans Parkway ~ P.O. Box 9517 ~ Columbus, GA 31908
706/324-6661 ~ Fax: 706/494-3103

NAME _Paula DeHank_____ AGE_____

ADDRESS _____

DATE _6 14 06_____

R̶

She Can Return to work

co of 6/19/06

with no lifting above 20lbs.

no excessive bending

Refill ____ times
☐ Label
This Prescription Authorized Through _____
by _____
Signature _____
DEA # _____

To insure brand name dispensing, prescriber must write "Brand Necessary" on the prescription.
OS1393B65

AFS  0077

# PLAINTIFF'S

# EXHIBIT N

**DeFrank v. Army Fleet Support, L.L.C.; Case No. 1:07-cv-775-WKW**

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

PAULA F. DeFRANK )
    Plaintiff )
  )
  )
v. )  CASE NUMBER 1:07-cv-775-WKW
  )
ARMY FLEET SUPPORT, L.L.C., )  (JURY DEMAND)
    Defendant )

## DECLARATION OF JOSEPH M. MILLER

I, Joseph M. Miller, do hereby swear and affirm under penalty of perjury as follows:

1.    I am over the age of twenty-one years, am competent to make this declaration, and have personal knowledge of the matters stated below.

2.    I have conducted a vocational evaluation of Paula F. DeFrank in connection with a lawsuit she has filed under the Rehabilitation Act arising out of her employment with Army Fleet Support, L.L.C.

3.    My qualifications to testify as an expert in this matter are set out in the attached curriculum vitae, which accurately summarizes them.

4.    In forming my opinions in this case I conducted a diagnostic interview of Ms. DeFrank; reviewed various medical and work records (identified in my report, which is attached); and conducted a vocational assessment of Ms. DeFrank.

5.    Certain of the records reviewed showed that Army Fleet Support, L.L.C. perceived Ms. DeFrank to have work-related limitations of no heavy lifting of objects weighing more than twenty pounds and no repetitive bending.  Although the records indicated these restrictions were stated for three-months duration, Ms. DeFrank was assigned these limitations, or more severe limitations, continuously by her physicians from June 2004, following her injury in January 2004, until Army Fleet Support refused to accommodate her return to work in July 2006.

6.    Ms. DeFrank's training and work experience has been as an Aircraft Mechanic. The specific vocational preparation time or the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in this job is rated as over two years up to and including four years. That would be classified as a Skilled occupation by the United States Department of Labor.  Skills and abilities required include: knowledge of tools, machines, materials, and methods used in trade or craft specialty; reading scale drawings

or blueprints to visualize objects; using shop math to calculate object dimensions, material amounts needed, and material costs; coordinating eyes, hands, and fingers to use hand tools or machines in constructing, making, or repairing objects; and adhering to object specifications or standards.

7.    Based on my vocational analysis, Army Fleet Support, L.L.C. perceived Ms DeFrank to be substantially limited in her ability to perform a class of jobs and a broad range of jobs in various classes, as compared to the average person with comparable skills and abilities. She is disqualified by the restrictions perceived by Army Fleet Support, L.L.C. from performing any job that involves the above requirements. She is not just restricted from performing the aircraft mechanic job for which she applied, but from 65.29% of the jobs in the state labor market requiring similar knowledge, skills, abilities, and work experience. In the eyes of Army Fleet Support, L.L.C., Ms. DeFrank would not have the capacity to perform a substantial number of jobs in a variety of classes in light of her work background and skills. These jobs exist in large numbers at the unskilled, semi-skilled and skilled levels of work and represent a broad range of jobs in various classes in our regional, state and national economies.

8.    My report, which is attached to this declaration, accurately summarizes my opinions and the bases for them.

Pursuant to 28 U.S.C. § 1746, I swear under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

Executed on this the 16 day of April 2008.

_Joseph M. Miller_
Joseph M. Miller
Vocational Consultant and Evaluator

2

JOSEPH M. MILLER                              207 Avenue "A" Southeast
VOCATIONAL SPECIALIST                         Lafayette, Alabama 36862
                                              (334) 864-5425

Date:   3/24/2008

Re:    Paula DeFrank                          SSN: 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

Background

Ms. Paula DeFrank, a 53 year old female, was referred for a Vocational Evaluation by
Jimmy Jacobs, Attorney at Law.  Ms. DeFrank was seen for her evaluation on 3/24/2008
in Dothan, Alabama.

Ms. DeFrank presents with history of initial injury occurring 1/5/2004 when she was
involved in a motor vehicle accident in Dothan, Alabama.

Notes of Dr. Diana M. Mancuso dated 1/7/2004 noted that Ms. DeFrank reported to the
emergency room where her neck and right shoulder was x-rayed.  She was noted to have
mild degenerative changes of the neck and evidence of previous right shoulder surgery.
The physician noted that Ms. DeFrank had been having a good deal of discomfort and
muscle spasms.  Dr. Mancuso indicated that at the ER she was provided Lortab because
she had neglected to tell them that she was allergic to Lorcet and therefore had not taken
anything for pain.  Dr. Mancuso prescribed medication for pain and noted that if she did
not improve she would be referred to an orthopedic physician. Otherwise, she would
return for a CPE with mammogram and fasting lab in two weeks.  It was noted that blood
pressure would also need a close follow-up.

Office note of Glenn C. Terry, M.D., noted that Ms. DeFrank's MRI at the Houston Clinic
showed bulge C6-7 disk that was pressing on the Thecal Sac.  MRI of the shoulder did not
demonstrate a rotator cuff tear, tendonosis or labral tear.  Medical impression was disk
injury was causing the posterior facet syndrome and possibly the bulged disk itself is quite
symptomatic and that it was causing the Levator Scapula Syndrome and some of the other
associated problems. Physician plan was to try a cervical epidural. Ms. DeFrank was
ordered not to work for three weeks.

Return to work slip dated 6/28/2004 indicated that Ms. DeFrank was authorized to return to work on 6/29/2004 with restrictions of no lifting/pushing/pulling over 20 pounds, no outstretched reach, no overhead work, no repetitive, no motion with arms and neck. The employer indicated that restrictions were able to be accommodated. A comment included work until 8/3/2004 with surgery scheduled for 8/5/2004. Physician note from Houston Clinic dated 6/29/2004 indicated Ms. DeFrank could return to modified duty with restrictions which were no lifting greater than 20 pounds, no pushing or pulling greater than 20 pounds, no outstretched reaching or work above shoulder level and no repetitive motion with arms and neck and surgery scheduled for 8/5/2004. The document was signed by Dr. Dorchak. Surgery scheduled was for anterior cervical fusion at C6-7.

Return to work slip signed by Dr. Dorchak dated 2/10/2005 indicated that Ms. DeFrank could return to work as of 2/15/2005 with no lifting above 25 pounds, no climbing and no excessive bending.

Dr. Diana Mancuso indicated that Ms. DeFrank could return to work as of 2/23/2005.

A return to work slip from Army Fleet Support dated 2/22/2005 noted that Ms. DeFrank was authorized to return to work on 2/23/2005 with restrictions of no lifting over 25 pounds, no climbing, no excessive bending. It was noted that the employer could accommodate medical restrictions. This was per Field Representative, George Anderson.

Return to work slip dated 7/6/05 from Army Fleet Support indicates that Ms. DeFrank was unable to work due to prescribed narcotic medication. It was noted that narcotic drugs could not be taken within six hours of shift start time nor during shift.

Return to work slip from Army Fleet Support dated 12/22/2005 indicates that last day worked was 7/15/2005 and Ms. DeFrank was authorized to return to work on 12/27/2005. Light duty restriction was no lifting over 20 pounds, no repetitive bending for three months. The document indicated that the employer could not accommodate medical restrictions per Field Representative, Lowell Green.

Return to work slip dated 1/11/2006 indicates that Ms. DeFrank had been authorized to return to work on 12/27/2005 with no lifting over 20 pounds, no repetitive bending for three months and the employer was able to accommodate these medical restrictions. This document was approved by Lowell Green with the comment that he had previously denied accommodation for these restrictions on 12/22/2005.

Return to work slip dated 2/6/2006 indicates that Ms. DeFrank's last day worked was 1/31/2006 and she was authorized to return to work on 2/6/2006, and that the employer could accommodate her restriction to wear sneakers. Document was signed per Field Representative, Lowell Green, dated 2/6/2006 with the comment "she needs to wear sneakers, per Lowell Green."

Return to work slip from Army Fleet Support dated 3/27/2006 indicates that Ms. DeFrank was authorized to return to work on 3/3/2006 with no lifting over 25 pounds, no excessive bending for three months and the employer was able to accommodate restrictions and could accommodate these restrictions. This was per Field Representative, Ron Farrington.

Note of 6/14/2006 indicates that Dr. Dorchak felt that Ms. DeFrank could return to work as of 6/19/2006 with no lifting above 20 pounds and no excessive bending for three months.

Education/work history

With respect to education, Ms. DeFrank reported that she completed high school in 1973 from the Jess Lanier High School, Bessemer, Alabama.

She also completed two years of technical school at the Alabama Aviation and Technical School for Air Frame and Power Plant from 1981 through 1983.

For the period of 3/1974 until 6/1980 Ms. DeFrank served in the U.S. Army and achieved the rank of E-4. Her job training and title was Aircraft Maintenance Technician.

With respect to employment, Ms. DeFrank has most recently been employed from 1/2000 until 4/2006 by the Army Fleet Support and its predecessor, DynCorp, as an Aircraft Mechanic. The Aircraft Mechanic job description summary is services, inspects, troubleshoots, repairs, modifies and overhauls aircraft and aircraft systems. Education requirements for this position include a high school diploma or equivalent and FAA Airframe and Power Plant (A&P) license, or two years aircraft maintenance experience. Ms. DeFrank reported a rate of pay of $24.27 and that she enjoyed her job.

Previously, Ms. DeFrank worked in Pensacola, Florida with Sears. She worked in the parts department and was involved with inventory, providing parts to technicians, taking orders. She reported earning $6.00-$7.00 per hour.

For the year or so prior to Sears, Ms. DeFrank worked at the Naval Air Depot, Pensacola, Florida. She was an Aircraft Mechanic and reported earning $12.00-$13.00 per hour. She left this position due to layoff at the depot. She enjoyed her job.

For the previous six years, Ms. DeFrank worked with Lear Seigler Services. This was from around 1985 to 1991. She worked in the parts department where she stocked parts, ordered parts and issued supplies and parts for helicopters. She reported earning $14.75 per hour and left this position due to a layoff by the contractor.

For the period of 1984 until October 1985 she was a temporary employee at the Naval Air Depot, Pensacola, Florida. Her job was aircraft mechanic and she worked on the A-4.

No arrest records and no use of alcoholic beverages was reported.

Activities of Daily Living

Ms. DeFrank indicates that she has problems reaching overhead and lifting heavy objects. She has help with her housework. She is able to prepare small meals. At the time that she was seen, she does not perform much driving. She does not perform yard work.

Vocational Interests

Ms. DeFrank indicates that recreationally, she loves the outdoors and used to do a great deal of walking. She was also a runner at one time, and used to enjoy working in gardens prior to her injury.

Vocationally, she has identified a list of jobs at her former employer that she feels that she could have done at the time of her termination. She believes that she could be a Material Inspector and took the test for this position while employed. She also feels that she could function effectively as a Technical Publications Technician. She also could have continued to perform as an Aircraft Mechanic handling parts return as she did from January 2005 until her leave of absence in April 2006.

Ms. DeFrank indicates that she has been terminated from her position as an Aircraft Mechanic by her employer, but believes she could have continued to work in that position if she had received accommodations. She also feels there are other jobs that she could do with modification to accommodate her restrictions. She believes that she could function as an Air Conditioning Technician/MDT Inspector. She could perform bench work as an Aircraft Engine Shop Mechanic or Aircraft Hydraulic Shop Mechanic or QDR Technical

Specialist, and certainly as a Technical Publications Technician. She also feels that she could function as a Material Inspector with some modification.

Conclusions

Ms. DeFrank is certainly highly qualified in her occupation and career. Although she has a loss to the overall labor market as a result of her injury and subsequent limitations as assigned by Dr. Dorchak, she is quite confident that there are positions which she could function in very effectively with her former employer with accommodations of her medical restrictions.

Prior to Ms. DeFrank's injury and subsequent limitations, she was capable of actively participating in 17% of jobs (or 300,587 jobs) within the State of Alabama.

Considering her current restrictions, she can now access and participate in 5.9% of jobs in the State of Alabama, or 104,321 jobs. Her differential loss of capacity to perform in 196,265 jobs constitutes a 65.29% vocational loss or vocational disability.

Contained within her retained access ability of about 34.70% of jobs, she feels confident that with accommodation she could perform a number of jobs with her former employer with reasonable accommodation and for which she does not feel she would be disabled from performing.

I wish to thank you for the opportunity to work with Ms. DeFrank. She was fully cooperative throughout her evaluation and interested in overall results and recommendation which could be made for her.

Thank you.

JOSEPH M. MILLER
Vocational Consultant

# PLAINTIFF'S

# EXHIBIT O

**DeFrank v. Army Fleet Support, L.L.C.; Case No. 1:07-cv-775-WKW**

October 19, 2006                                   **Certified Mail – Return Receipt Requested**

Ms. Paula F. DeFrank
148 Radford Circle
Dothan, AL  36301

Dear Ms. DeFrank,

Your status will be changed effective 10/12/06, from medical leave of absence to administrative termination.  This change is for administrative reasons only and will not affect your rights in accordance with article 4.6(d) of the Collective Bargaining Agreement.

In accordance with Article 25.10(d) of the Collective Bargaining Agreement, you are eligible for extended insurance benefits until on or around 04/05/2011, by paying the full cost of premiums.  Following is a list of your insurance.  You may continue all or part of this coverage.  *Please Note:* You can only keep life if you keep the health insurance through the company*.

|  |  |
|---|---|
| Health (Employee Only): | $306.00 |
| RX Card (Employee Only): | $ 12.00 |
| Vision (Employee Only): | $  6.29 |
| Safety Eyewear (Employee Only): | $  1.24 |
| Dental (Enhanced Employee): | $ 35.93 |
| Personal Accident (Employee - $300,000): | $  6.00 |
| **Basic Employee Life: | $ 14.15 |
| Accidental Death & Dismemberment: | $  0.95 |
| **Optional Employee Life: | $ 19.40 |
| **TOTAL Monthly Premium:** | **$401.96** |

*Please complete the enclosed Employee Continuation Enrollment Form, indicating the coverage you elect to continue or decline, and return to our office as soon as possible.* **If we do not receive this form back within 10 days, we will assume you do not wish to continue any coverage and your insurance will be cancelled.  However, please be advised that your insurance account is currently past due for May-October in the amount of $546.08.  Attached you will find a detailed payment history indicating same.  In accordance with article 25.10(b) of the Collective Bargaining Agreement, this amount must be paid in full immediately to avoid cancellation of benefits.**

*Once you receive a Waiver of Premium, your life insurance benefits continue to the age of 65 (if you remain disabled) whether or not you continue your health insurance benefits.

**If you were under age 60 at the time your leave of absence began, a request for Waiver of Premium has been submitted to Minnesota Life for your life insurance coverage.  Upon receipt of an approval letter from Minnesota Life we will notify you by mail, and you will no longer be required to pay your life insurance premiums.

You also have a legal entitlement to continue your medical, dental and vision coverages under COBRA by paying 102% of the above premium costs for 18 months.  If you remain disabled at the end of 18 months, you would be eligible for extended COBRA coverage for up to a total of 29 months, assuming disability continues for this period.  From the 19th to the 29th month, disability coverage under COBRA costs up to 150% of the full cost of the coverages.  If you choose to elect coverage under the CBA instead of COBRA, your COBRA entitlement period will run concurrently with CBA coverage for the length of your COBRA entitlement. If you elect CBA coverage and that coverage ends for any reason prior to the end of your COBRA entitlement, you would be eligible for COBRA coverage for the balance of your COBRA entitlement.  You will be provided more detailed information on COBRA under separate cover.

If you have any questions regarding this matter please call 334-598-0413.

Sincerely,

*Lisa Beasley*

Lisa M. Beasley
Personnel Specialist

AFS  0058

cc:  IAM Local 2003
     Manager, Hanchey
     Personnel File

36362 0200    (334) 598-0413 - Fax (334) 598-0476